211 F.Supp.2d 520 (2002)
Scott HUMINSKI, Plaintiff,
v.
RUTLAND COUNTY SHERIFF'S DEPARTMENT; Nancy Corsones, Vermont District Court Judge, individually and in her official capacity; Karen Predom, Vermont District Court Manager, individually and in her official capacity; R.J. Elrick, Rutland County Deputy Sheriff, individually and in his official capacity; M. Patricia Zimmerman, Vermont District Court Judge, individually and in her official capacity, Defendants.
No. 1:99-CV-160.
United States District Court, D. Vermont.
July 11, 2002.
*521 *522 William Edward Kraham, Brattleboro, VT, Robert L. Corn-Revere, Hogan & Hartson, Washington, DC, for Plaintiff.
Pietro J. Lynn, Heather Elaine Thomas, Lynn & Associates, P.C., Burlington, VT, Joseph Leon Winn, Vermont Attorney General's Office, Montpelier, VT, Paul L. Reiber, Reiber, Kenlan, Schwiebert & Facey, P.C., Rutland, VT, for Defendants.

*523 OPINION AND ORDER

(Papers 120, 123, 125, 128, 132, 145)
MURTHA, District Judge.
Plaintiff Scott Huminski brings this lawsuit under 42 U.S.C. § 1983 claiming Defendants two Vermont state judicial officers, a state court clerk, a county sheriff's department, and a county sheriffviolated his rights under the First and Fourteenth Amendments of the United States Constitution by causing him to be served with criminal trespass notices prohibiting him from entering all state court facilities or grounds.[1] Huminski received the notices shortly after he displayed protest signs criticizing the judicial conduct of Defendant Nancy Corsones, a Vermont District Court judge, in a state-owned public parking lot located adjacent to the Vermont District Court building in Rutland, Vermont. Huminski's suit requests declaratory, injunctive, and monetary relief against Defendants Corsones, M. Patricia Zimmerman, Karen Predom and R.J. Elrick, in their official and personal capacities.[2]
On February 27, 2001, the Court granted Huminski's motion for a preliminary injunction and temporarily barred Defendants from enforcing the trespass notices if they "are based solely upon Huminski's public expression of his political opinions so long as the expression does not disrupt or threaten the orderly performance of court business." See Huminski v. Rutland County, 134 F.Supp.2d 362, 366 (D.Vt.2001) (Paper 67). Huminski now seeks a permanent injunction by moving for summary judgment. Defendants, asserting various immunity defenses, oppose Huminski's motion and also move for summary judgment.
Because there is a genuine factual dispute whether Defendants Nancy Corsones, M. Patricia Zimmerman and Karen Predom caused the trespass notices to be served due to legitimate concerns about courthouse security, or, instead, because of their disagreement with the views expressed by Huminski, the Court DENIES the motions of those Defendants. Given the factual dispute, however, the Court also finds there is no reasonable likelihood Plaintiff will prevail on his claims for declaratory and permanent injunctive relief. Accordingly, the Court DISSOLVES its prior grant of preliminary injunctive relief (Paper 67).
Finally, for additional reasons clarified below, the Court DENIES Plaintiff's motion for summary judgment and GRANTS summary judgment in favor of Defendants Elrick and Rutland County Sheriff's Department.

I. Background

As this case is now before the Court on cross-motions for summary judgment, the following facts, except where noted, are undisputed:[3]

*524 A. Huminski's Protest and the Notices Against Trespass

On May 24, 1999, at approximately 7:30 a.m., Scott Huminski legally parked his van in a public parking lot located immediately adjacent to the Vermont District Court building at 92 State Street in Rutland, Vermont. The land on which the parking lot sits is owned by the State of Vermont.
Displayed on one side of Huminski's van were three posters, measuring 45 inches by 54 inches, on which was written:
JUDGE CORSONES, BUTCHER OF THE CONSTITUTION
 STRIPS DEFENDANTS OF RIGHT TO DEFENSE COUNSEL
 REINSTITUTES CHARGES VIOLATING ART 11, CH 1, VT CONST.
 PUNISHES PROTECTED EXPRESSION WITH CRIMINAL CHARGES
 MALICIOUSLY DISREGARDS DOUBLE JEOPARDY BY REINSTITUTING CHARGES AFTER CONVICTION AND FULL PUNISHMENT
 SUBVERTS DUE PROCESS BY VACATING BINDING PLEA AGREEMENT POST-PUNISHMENT
 UNCONSTITUTIONALLY PUNISHES DEFENDANT FOR SEEKING REDRESS OF GRIEVANCE IN CIVIL COURT
 IGNORES AND ENCOURAGES PROSECUTORIAL VIOLATIONS OF THE CODE OF PROFESSIONAL RESPONSIBILITY
The signs caught the attention of Rutland County Deputy Sheriffs Mark Beezup and Steven Schutt, who were stationed that morning at the District Court. After the deputy sheriffs determined that the van belonged to Scott Huminski and observed him seated in the front of the van, they requested he remove the signs from the van or move the van to another space in the parking lot. Huminski refused, telling them he planned to observe judicial proceedings in the District Court.
Huminski had no scheduled court appearance that morning, but he had a prior history with the Vermont criminal justice system, in particular with Judge Corsones. Judge Corsones presided over State v. Huminski, Docket No. 203-2-97, a criminal case brought in Vermont District Court in Bennington, Vermont in 1998 by Bennington County State's Attorney William Wright. In the course of that proceeding, on September 3, 1998, Judge Corsones granted the State's motion to vacate as "involuntary" a plea agreement that would have resolved two obstruction of justice charges filed against Huminski.[4] The next day, September 4, 1998, Huminskievidently upset by the rulingfiled a formal complaint against Judge Corsones with the Vermont Judicial Conduct Board.[5] Huminski later sued Judge Corsones in Vermont Superior Court for alleged violations of his constitutional rights.[6]
In addition to his formal efforts to challenge Judge Corsones and the State's handling *525 of his case, Huminski sent "complaint" letters to various state officials. Copies of two of Huminski's letters, addressed to officials at the Vermont Attorney General's office, were brought to Judge Corsones' attention.[7]
One of the letters, undated and addressed to Cindy Maguire, Chief of the Criminal Division of the Attorney General's Office, contained the following:
As it is the policy of the State of Vermont to encourage and allow crimes to be committed against myself and my wife without fear of prosecution I must take the law into my own hands and initiate activities that will get national media attention.... Vermont's policies ... have destroyed my life.... A State cannot target an innocent citizen for destruction. When the smoke clears, the nation will wonder what went wrong in Vermont. Hopefully that inquiry will prevent you from doing this to someone else.
* * * * * *
You might achieve [State's Attorney William] Wright's goal of driving us out of Vermont (or killing us) and attaining my destruction, not without a fight. The conflict has begun. My demise won't be in vain. There will be national publicity and an outside investigation. Its [sic] odd how people like you who wonder why citizens form militias and arm themselves, now I know why. The government does target people for purely political reasons and the criminal justice system and law enforcement is a tool used by corrupt agencies to kill innocent civilians. For twenty months I have given the State multiple opportunities to prove that my assumptions in this letter were wrong, now its [sic] time for action as the State has revealed that corrupt policies are in place at the highest levels. Bill Wright's policies are being obeyed by the attorney general's office. No justice. No fairness. No constitution. No rights. Someone will be held accountable.
Paper 127, Ex. 2.
The other letter, dated September 3, 1998 and addressed to Vermont Attorney General William Sorrell, read, in part:
This State is crooked to the core. Your willingness to pervert the law of the State of Vermont for the purpose of attacking one person is criminal. I believe the state will prevail in its goals, however, I believe my future activities will prevent the state from engaging in this behavior ever again. I require a response to my previous correspondence by noon today. Continued evidence of your corrupt behavior requires that I accelerate my activities.
Id., Ex. 3.
In addition to the two letters, Huminski also sent at least three other letters to Corsones concerning her handling of his criminal case. These letters were sent by tele-facsimile to Corsones' former law office, where her then-husband worked as an attorney.
Finally, on numerous occasions prior to May 24, 1999, while Judge Corsones presided over cases at the Vermont District Court in Bennington, Huminski engaged in protests in the courthouse parking lot. These protests, not unlike the activities of May 24, entailed parking his van in the courthouse parking lot with signs expressing his opinions on the side of the vehicle facing the building. During the protests, however, Huminski's signs never criticized Judge Corsones; they criticized the conduct *526 of State's Attorney William Wright and Deputy State's Attorney John Lavoie. Furthermore, at no time during the protests at the District Court in Bennington did any government official or security personnel investigate the van or request that he leave, move his van, or remove his signs. Huminski also never received a notice against trespass. Corsones knew of Huminski's protests in Bennington and that they were directed at the State's handling of his criminal case.[8]
While in her District Court office in Rutland on the morning of May 24, 1999, Corsones learned from Schutt that Huminski's van was parked in the lot immediately outside the courthouse with signs attached criticizing her judicial conduct. Schutt also expressed his concern to Corsones about Huminski's presence. Corsones then met with Defendant Karen Predom, the Clerk or Court Manager of the District Court, and explained the following: (1) Corsones was concerned about security at the courthouse because of Huminski's presence that morning; (2) Huminski was protesting over a prior case in Bennington in which Corsones had issued a ruling against him; (3) he had previously sent faxes of a threatening nature to her then-husband's law office in Rutland concerning her handling of Huminski's criminal case; (4) he had protested the State's handling of his case by placing signs on the outside of his van while parked at the District Court building in Bennington; and (5) due to her concerns about security, Corsones was unwilling to take the bench that morningdespite a heavily-scheduled docket unless Huminski left the District Court building.[9]
In addition to the information she learned from Corsones, Predom also saw the signs on Huminski's van when she parked her car that morning at the District Court building.
After Corsones and Predom conferred about Huminski, they spoke over the phone with Ed Polk, the chief of security for all Vermont courts. Predom told Polk she was concerned the van posed a security threat to the courthouse, in part because it was parked quite close to the building and the van's windows appeared *527 to be "blacked-out" or obstructed. Polk recommended, among other possible actions, investigating the van further, or issuing a trespass notice to prevent Huminski from parking his van in the courthouse parking lot.
At about this time, Defendant R.J. Elrick, a Deputy Sheriff of the Rutland County Sheriff's Department, while at work at the Department's office at 79 Center Street in Rutland, learned Huminski was at the District Court in Rutland. Elrick also was informed Huminski had parked his vehicle in the court parking lot with signs on it and court staff had expressed concern for their safety. Shortly after receiving this information, Elrick proceeded to the District Court on State Street. Although he saw Huminski's van at a distance on approaching the District Court, and observed there were signs on the van, he was never close enough to read any of the signs.
Inside the District Court building, Elrick was told by Corsones that Huminski was the individual she previously warned Elrick about as a potential security concern. Elrick already knew the following about Huminski: (1) Huminski had regularly protested outside the District Court in Bennington and thus created "a sense of fear amongst the employees of the courthouse in Bennington that he was there to intimidate them"; (2) Judge Corsones presided over a criminal case brought against Huminski and held concernswhich she expressed to Elrickabout courthouse security in Rutland because of Huminski's behavior in the aftermath of the case; and (3) the Bennington County Sheriff's Department distributed an "officer safety bulletin" to the Rutland County Sheriff's Department indicating Huminski was a potential security concern in light of his past behavior at the courthouse in Bennington.
At about 8:30 a.m., Predom contacted the Rutland City Police Department to request Huminski be served with a trespass notice and Rutland City Police Officer Robert Emerick responded. Following Predom's instructions, Emerick filled in the blank spaces on a form entitled "Notice Against Trespass," writing that Huminski was not to "enter ... or remain upon ... properties controlled by or utilized by the District Court including all parking areas ... [e]xcept you may enter only when you have a written notice from the Court directing your appearance or if you have made prior arrangements or permission of the Court Manager." Paper 127, Ex. 5. Predom signed the form as "owner/tenant" for the District Court in Rutland, and listed her title as "Court Manager." Id.
At about this time, Predom called Defendant M. Patricia Zimmerman, a Vermont District Court judge who was presiding over the State Family Court at a different courthouse in Rutland. Predom asked Zimmerman to swap dockets that morning with Corsones, evidently to spare Corsones the burden of seeing or dealing with Huminski. Predom explained to Zimmerman that Huminski was parked close to the entrance of the District Court and was displaying protest signs criticizing Judge Corsones. Zimmerman thought Predom's request "unusual," and was not told that Huminski posed a security threat.
At about 8:46 a.m., Deputy Sheriff Schuttafter speaking with Corsones and Predom about the van and apparently unaware that Predom had earlier called the Rutland City Policecalled in a "trespassing" complaint to the Rutland County Sheriff's Department. Judge Corsones was named as the "complainant" in the incident report describing the request for a trespass notice.
*528 At approximately 8:50 a.m., Huminski left his van and entered the District Court building. Huminski passed through the security checkpoint of the building without incident, and did not exhibit any belligerent behavior, carry any weapon, or make verbal threats.
At approximately 8:54 a.m., Emerick, accompanied by Elrick, served the Notice Against Trespass form on Huminski. The form indicated it was issued pursuant to Title 13, Vermont Statutes Annotated, Section 3705. Emerick signed the form as the officer performing service upon Huminski, but Huminski refused Emerick's request to sign the form. Elrick signed the form at the bottom, with an annotation as "Witness."
Shortly after being served with the notice pertaining to the District Court building and grounds, Huminski was served by Deputy Sheriff Schutt with a second trespass notice. This notice prohibited Huminski from entering Judge Corsones' home and real property in Mendon, Vermont, as well as her then-husband's law office located in Rutland. This second notice was prepared and served at the express direction of Judge Corsones.
Huminski was then told by the officers that he would be arrested if he did not leave the District Court immediately. Huminski complied without incident or complaint.
Subsequent to the events of May 24, 1999, Elrick was told by various state officials that under a newly-enacted Vermont law, only the Vermont Court Administrator's Office had authority to issue trespass notices pertaining to state court buildings. The new statute also specified that the Vermont Commissioner of Buildings and General Services had the exclusive authority to issue such notices as to the land surrounding state court buildings. Elrick therefore contacted the Vermont Commissioner of Buildings and General Services, Tom Torti, and received permission to signon behalf of the Commissionera "renewed" notice of trespass against Huminski.
Thus, on May 27, 1999, a third notice was issued to Huminski, which Elrick signed on behalf of the Commissioner. Judge Zimmerman signed the form as well, evidently on behalf of the Court Administrator's Office, after she spoke by telephone with Francis B. McCaffrey, the Administrative Judge for Trial Courts in Vermont. Judge McCaffrey expressly requested that Zimmerman sign the form, explaining that Huminski had a dispute with Judge Corsones and at times attempted to contact her through her then-husband's law office.[10]
In contrast to the earlier notice signed by Predom, however, this third notice was not limited in scope to the property and grounds of the District Court building in Rutland. Instead, the May 27, 1999 notice expressly covered: "All lands and property under control of the Supreme Court and the Commissioner of Buildings and General Services, including the Rutland District *529 Court, parking areas, and lands." Paper 127, Ex. 6.[11]

B. Defendants' Motivations

Each Defendant in this case has asserted during sworn deposition testimony that their conduct was motivated by a well-founded concern that Huminski posed a risk to their own safety and security or that of the District Court. The Court finds there is a genuine dispute as to whether Defendants' actions were motivated out of security concerns, or, as Plaintiff contends, out of their disagreement with the views expressed by him on the morning of May 24, 1999.
There are circumstantial factors that lend support to Defendants' position. For example, on the morning of May 24, 1999, Judge Corsones was aware of the following: (1) through the faxes sent to her former law office and the ongoing protest in the District Court parking lot, Huminski was upset with her because of the ruling she made against him; (2) in two letters to State officials, addressing the State's conduct in the same criminal case Corsones handled, Huminski expressed what could be reasonably construed as an intent to cause a disturbance;[12] (3) Deputy Sheriff Schutt, a trained law enforcement officer assigned to the District Court to provide security, expressed concern about Huminski's presence when he reported to Corsones on the morning of May 24; (4) Ed Polk, the chief of security for all Vermont court facilities, recommended, among other actions, issuing a notice against trespass to Huminski;[13] and (5) court staff in Bennington had expressed a general concern to Corsones about Huminski's frequent presence at the District Court building and grounds. Furthermore, Corsones' decision to request a trespass notice for her home and her then-husband's law office further confirms that her actions may have been motivated out of a concern for her safety.
As for Predom, the information she received from Corsones and Polk supports *530 the conclusion she was motivated by security concerns.[14] Similarly, the information Elrick possessed about Huminski, including the prior discussion on court security he had with Corsones, supports his contention that he acted to ensure courthouse security. Finally, Judge Zimmerman knew very little about the events of May 24, 1999; Predom's phone call disclosed the subject matter and viewpoint of Huminski's protest but did not raise the issue of courthouse security. It is also clear, however, that Zimmerman signed the second trespass notice after her discussion with Judge McCaffrey, who requested her cooperation because of a security concern in light of Huminski's behavior toward Judge Corsones.[15]
Despite these factors favoring Defendants, however, there are sufficient countervailing factors to create a genuine dispute as to Defendants' motivations.
First, at all relevant times, Corsones, Predom, and Zimmerman knew that Huminski's May 24 protest signs contained pointed criticism of Judge Corsones.[16]
Second, Huminski appeared before Judge Corsones at least four times prior to May 24, 1999, and never disrupted the proceedings or threatened to harm anyone. And even though he regularly attended state court proceedings, there was no evidence that he had ever caused a disturbance.
Third, Huminski made no implicit or overt threats during the morning of May 24.[17] He clearly stated to Beezup and Schutt that he was there to observe court proceedings. The deposition testimony of at least one law enforcement officer described Huminski as peaceful and respectful in his overall demeanor and verbal expressions. The trespass notices were issued to Huminski after he passed through court security screening and at least three armed law enforcement officers were present at the courthouse at all times. These facts negate the contention he was a security risk.
Lastly, Huminski was a frequent protester on District Court property in Bennington and his actions never caused court staff or security personnel to serve him with a trespass notice, much less request he move his van off the courthouse parking lot. This factor is particularly suggestive, given that none of Huminski's prior protests were directed at Judge Corsones. Indeed, that Corsones and others were aware of Huminski's prior protestsand even heard concerns about such protests from court staffyet never took any affirmative action toward Huminski until he directed the protests at Judge Corsones, supports the inference that the trespass *531 notices were issued in retaliation for Huminski's message.
In conclusion, without discrediting Defendants' sworn deposition testimony, or resolving the issue in either party's favor, there is genuine dispute as to the motivations of Defendants Zimmerman, Corsones, and Predom.
For the purposes of resolving Plaintiff's demand for equitable relief, neither party has presented evidence suggesting relevant circumstances have materially changed since the time the notices originally issued. For example, there is no evidence Defendants have taken any action to rescind, retract, or nullify the trespass warnings.[18] There is no reason, therefore, to conclude Huminski does not face a credible threat of arrest and prosecution for entering state court buildings or adjoining grounds. Cf. Vermont Right to Life Comm., Inc. v. Sorrell, 221 F.3d 376, 383 (2d Cir.2000).
On the other hand, if Defendants' security concerns in 1999 were reasonable, the Court is unable to conjecture that such concerns should have dissipated in the past three years. In that sense, the question whether Huminski presently poses a security threat sufficient to justify the trespass notices is inextricably tied to the question whether Huminski posed a legitimate security threat in May of 1999. Given the factual dispute over that latter issue, and since there is no evidence suggesting circumstances have otherwise materially changed, the Court is unable to conclude as a matter of law that Huminski does not currently pose a security threat sufficient to justify the trespass notices.

II. Discussion

A. State Sovereign Immunity and Municipal Liability under Section 1983

As a preliminary matter, and in order to clarify the issues before the Court, Defendants Corsones and Zimmermanboth state officials for purposes of the doctrine of state sovereign immunity are immune from suit in federal court insofar as retrospective damages are sought against them in their official capacities for violations of federal law. See Huminski v. Rutland County, 148 F.Supp.2d 373, 379 (D.Vt.2001) (Paper 73). For the same reason, the Court now finds, sua sponte, Defendant Predom immune from retrospective (i.e., monetary) relief sought against her in her official capacity.[19]
Defendant Elrick is a deputy sheriff and employee of the Rutland County Sheriff's Department. Under Vermont law, however, county sheriffs act as policymakers for the State of Vermont when they provide security services at state courthouses and adjoining lands. See 29 V.S.A. § 171; cf. McMillian v. Monroe County, 520 U.S. 781, 117 S.Ct. 1734, 138 L.Ed.2d 1 (1997). There is no basis for "official capacity" or municipal liability unless the county officer is sued in his official capacity for actions he took as the final policymaker for the county government. See McMillian, supra; Pembaur v. City of Cincinnati, 475 U.S. 469, 483, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). Because Elrick acts for the State in the area of state courthouse security, Elrick cannot be held liable in his official capacity for Huminski's Section 1983 claims. See Monell v. Dep't *532 of Soc. Servs., 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); Morris v. Lindau, 196 F.3d 102, 111 (2d Cir.1999).[20]
Moreover, because Elrick represents Vermontnot Rutland County when he performs security services at state courthouses, he must be considered a state officer for purposes of the doctrine of state sovereign immunity. Sovereign immunity deprives this Court of jurisdiction over supplemental state law claims filed against state officers. See Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 121, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). Accordingly, Huminski's state law claims against Elrick, Corsones, Zimmerman, and Predom must be dismissed for lack of subject-matter jurisdiction.
Currently at issue, therefore, is Plaintiff's request for monetary relief against Defendants Corsones, Zimmerman, Predom, and Elrick in their personal capacities for alleged past violations of federal constitutional law,[21] and a request for permanent injunctive and declaratory relief against Corsones, Zimmerman, and Predom in their official capacities[22] for alleged ongoing federal constitutional violations.

B. Judicial Immunity

Defendants Corsones and Zimmerman assert judicial immunity as an affirmative defense. It is well established that judges are absolutely immune from Section 1983 claims for equitable and monetary relief arising from actions taken in their judicial capacity. See Montero v. Travis, 171 F.3d 757, 760-61 (2d Cir.1999); Sundwall v. Leuba, No. Civ.A. 300CV1309(JCH), 2001 WL 58834, at *7 (D.Conn. Jan. 23, 2001); 42 U.S.C. § 1983 (as amended Oct. 19, 1996 by the Federal Courts Improvement Act, Pub.L. No. 104-317, Title III, § 309(c), 110 Stat. 3847, 3853).
The factors determining whether an act is a "judicial" one "relate to the nature of the act itself, i.e., whether it is a function normally performed by a judge, and to the expectations of the parties, i.e., whether they dealt with the judge in his [or her] judicial capacity." Stump v. Sparkman, 435 U.S. 349, 362, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978) (emphasis added). "In other words, [courts] look to the particular act's relation to a general function performed by a judge." Mireles v. Waco, 502 U.S. 9, 13, 112 S.Ct. 286, 116 L.Ed.2d 9 (1991). The question of motive or intent is wholly irrelevant to the question *533 whether judicial immunity applies. See Cleavinger v. Saxner, 474 U.S. 193, 200, 106 S.Ct. 496, 88 L.Ed.2d 507 (1985) (citing Bradley v. Fisher, 13 Wall. 335, 347, 20 L.Ed. 646 (1871)); Pierson v. Ray, 386 U.S. 547, 554, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967); Tucker v. Outwater, 118 F.3d 930, 932 (2d Cir.1997); Heimbach v. Vill. of Lyons, 597 F.2d 344, 347 (2d Cir.1979) ("Thus, while Justice Perry may have acted maliciously in signing a criminal arrest warrant against appellant Heimbach, ... the justice is nonetheless immune from suit ... for his actions.").

A. Judge Corsones

As a preliminary matter, Corsones argues she is not liable because she played no role in the decision-making process which led to the trespass notices being written, signed, and served on Huminski. Corsones' contention fails for a number of reasons.
First, she not only personally provided Predom and Elrick with information about Huminski's prior behavior, but she also did not object to Polk and Predom's strategy for handling Huminski, namely, to serve him with a trespass notice barring him from the District Court building and grounds. This factor is at least proof that Corsones knew Huminski was likely to be served with the trespass notice. Second, Corsones indicated to Predom that she would not take the bench that morning, despite a heavily-scheduled docket, unless Huminski left the District Court building. Corsones was the presiding judge at the District Court. By telling Predom she was conditioning her decision to take the bench on Huminski leaving the building, Corsones impliedly authorized Predom who Corsones knew was charged with managing the normal flow of court business to take some official action to ensure Huminski left the building.
In sum, Corsones' involvement is sufficient to trigger personal liability because she: (1) expressly raised her concerns to law enforcement officers and other subordinates about Huminski's presence; (2) made clear that official business would stop unless Huminski left the District Court building; thus (3) impliedly authorized her subordinates to take some official action to ensure Huminski's removal, fully aware Huminski would likely receive a trespass notice. Compare Colon v. Coughlin, 58 F.3d 865, 873 (2nd Cir.1995) (listing factors necessary to show personal involvement under Section 1983).
Turning to the question of Corsones' judicial immunity, the Court finds the issuance of a criminal trespass notice in Vermont is not a judicial act.
First, under Vermont's criminal trespass statute, the service of a "notice against trespass" document merely satisfies the "actual communication" element of the offense under subsection (a) of the statute. See Vt.Stat.Ann. ("V.S.A.") tit. 13, § 3705(a)(1) (1998) (stating that a notice against trespass may be given by "[a]ctual communication by the person in lawful possession or his agent or by a law enforcement officer acting on behalf of such person or his agent"). The statute nowhere contemplates judicial involvement for such a notice to be served, much less a prior quasi-judicial adjudicatory process. Indeed, criminal liability may occur under subsection (a) when no such notice document is physically served and no judicial or law enforcement officers are involved, provided "[s]igns or placards [are] so designed and situated as to give reasonable notice [against trespass]." 13 V.S.A. § 3705(a)(2). Moreover, the duty of law enforcement officers to serve a notice pursuant to a landowner's request is not a function of any inherent judicial power. *534 See, e.g., 12 V.S.A. § 691 et seq.; 24 V.S.A. § 293.
Second, it is telling that on the same morning Huminski received the first notice barring him from the District Court building and grounds, Corsones directed Deputy Sheriff Schutt to serve Huminski with an additional notice barring him from entering her own property and the offices of her then-husband's law firm. Just as Corsones was acting in her capacity as a mere landowner in requesting the issuance of this second notice, she acted in a similarly non-judicial capacityas the representative of the true landowner (the State of Vermont)in facilitating the issuance of the initial trespass notice.
Third, the general rule that judges act in a judicial capacity whenever they order the removal of persons from their courtroom who disrupt or otherwise negatively impact the judicial process, see, e.g., Sheppard v. Maxwell, 384 U.S. 333, 358, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); Sheppard v. Beerman, 18 F.3d 147, 152 (2d Cir.1994), does not apply here.[23] The first trespass notice was served on Huminski before courtroom proceedings had commenced that morning, and the notice ordered him to leave both the buildings and grounds of the District Court in Rutland, not merely the courtroom areas. There is no evidence Huminski's conduct interrupted or otherwise negatively impacted judicial proceedings at the District Court. Indeed, despite a well-known history of protest activities at the District Court in Bennington, Defendants present no evidence that Huminski ever disrupted or otherwise negatively impacted the course of a single, prior judicial proceeding.
Furthermore, providing security at a courthouse building is the sort of routine policing activity that takes place at numerous public facilities and government offices; security activities do not resemble an adjudicative or other traditional function of a court or judge. Cf. Fanoele v. United States, 975 F.Supp. 1394, 1401 (D.Kan.1997) ("Decisions involving the scope of security protection at federal [courthouse] buildings generally are grounded in economic, social, and political considerations.") (citations and quotations omitted).
In addition, although 29 V.S.A. § 171 entrusts the Vermont Supreme Court with the duty to maintain security at all Vermont courthouses, the statute does not transform every trespass notice issued by a state judicial officer into a judicial act. The statute does not affect or expand the jurisdiction of Vermont judges in the sense of giving them adjudicatory power; the statute confers power on the Vermont judiciary in their administrative capacities.
Lastly, Corsones' actions were non-judicial because Huminski had no official business *535 before the Vermont District Court that morning. Huminski was clearly protesting Corsones' judicial as opposed to personal conduct, but his signs "dealt with" Corsones in her judicial capacity no more than Operation Rescue or the Planned Parenthood Foundation deal with the U.S. Supreme Court in its judicial capacity when those organizations protest in Washington on abortion rights decisions.

2. Judge Zimmerman

For the same reasons that apply to Judge Corsones, Judge Zimmerman does not enjoy judicial immunity for signing the May 27, 1999 trespass notice. The very broad scope of the notice, coupled with the fact her action was taken upon the request of the chief administrative judge, confirms that Zimmerman's actions were not an exercise of her inherent authority as a judge to maintain decorum, safety, and effective judicial processes inside her own courtroom.[24]
In conclusion, Judge Corsones and Judge Zimmerman are not entitled to the defense of judicial immunity.

B. Plaintiff's Claims for Monetary and Equitable Relief

Having resolved the question of judicial immunity, the Court now considers first, whether Defendants are immune from Plaintiff's monetary claims under the doctrine of qualified immunity, and second, whether Plaintiff has demonstrated actual success on the merits, in order to prevail on his claims for declaratory and permanent injunctive relief.[25]

1. Qualified Immunity

State and municipal officers sued under Section 1983 are immune from claims for monetary relief "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).
Evaluating a motion for summary judgment on the basis of qualified immunity requires a two-step analytical process. First, the Court must determine whether Defendants' conduct violated a constitutional right. See Hope v. Pelzer, 536 U.S. ___, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) (citing Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)).[26] If no constitutional right was *536 violated, the Court must dismiss all claims for monetary relief. See Saucier, 533 U.S. at 201, 121 S.Ct. 2151.
On the other hand, if past violation is found, the next, sequential step is to ask whether the right "was clearly established at the time the violation occurred." Poe v. Leonard, 282 F.3d 123, 132 (2d Cir.2002) (quoting Saucier, 533 U.S. at 202, 121 S.Ct. 2151). A right is "clearly established" if it is defined with "reasonable specificity" under decisional law of the Supreme Court or Second Circuit, and a reasonable official would have understood that his or her acts were unlawful. African Trade & Info. Ctr., Inc. v. Abromaitis, 294 F.3d 355, 359-60 (2d Cir.2002) (citing Shechter v. Comptroller of New York, 79 F.3d 265, 271 (2d Cir.1996)).

a. Alleged Constitutional Violations

Huminski claims his constitutional rights were violated in two respects. First, the trespass notices denied him the right under the First Amendment to attend and access court proceedings for the purpose of gathering and disseminating information. See Pl.'s Mem. in Supp. of Mot. for Partial Summ.J. (Paper 122), at 2. Second, "[t]he trespass notices discriminate against Huminski because of his views, and they unreasonably limit the expression of his opinions." Id.[27]
The Court agrees that the trespass notices clearly implicate the First Amendment. See, e.g., Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980); Niemotko v. Maryland, 340 U.S. 268, 282, 71 S.Ct. 328, 95 L.Ed. 280 (1951) (Frankfurter, J., concurring in result); Gagliardi v. Vill. of Pawling, 18 F.3d 188 (2d Cir.1994); Westmoreland v. Columbia Broadcasting Sys., Inc., 752 F.2d 16 (1984). But cf. In re the Herald Co., 734 F.2d 93, 100 (2d Cir.1984) ("To claim a value in access to information, even information concerning significant governmental activities, comparable to the value of freedom of expression, is to ignore 200 years of First Amendment jurisprudence.").
Even though the "First Amendment does not guarantee access to property simply because it is owned or controlled by the government," United States Postal Serv. v. Greenburgh Civic Ass'ns, 453 U.S. 114, 129, 101 S.Ct. 2676, 69 L.Ed.2d 517 *537 (1981), when the government is "acting in its proprietary capacity, [it] does not enjoy absolute freedom from First Amendment constraints," United States v. Kokinda, 497 U.S. 720, 725, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990).

b. Forum Analysis

Upon finding that the activity at issue implicates protected speech, the next step is to "determine the level of scrutiny that applies to the regulation of protected speech at issue." Kokinda, 497 U.S. at 725, 110 S.Ct. 3115. "In evaluating government regulations concerning private individuals' speech on government-owned property, the Supreme Court has identified three categories of forumsthe traditional public forum, the designated public forum, and the nonpublic forumand has developed a body of law styled `forum analysis.'" Perry v. McDonald, 280 F.3d 159, 166 (2d Cir.2001) (citing Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. 788, 802, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985), and Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983)). The Second Circuit recently reiterated the "forum analysis" standards, as follows:
[1] A traditional public forum is property, such as a public street or a park, that by long tradition or by government fiat has been devoted to public assembly and debate. Government restrictions on speech in a traditional public forum are subject to strict scrutiny and must be necessary to serve a compelling state interest and narrowly drawn to achieve that interest. [2] A designated public forum is created by purposeful governmental actionthat is, when the government intentionally opens a nontraditional forum for public discourse. Restrictions on speech in a designated public forum are also subject to strict scrutiny. [3] Other governmental properties are nonpublic forums. The government may impose restrictions on speech in a nonpublic forum as long as these restrictions are reasonable and viewpoint-neutral.
Id. (internal citations and quotations omitted, emphasis added).
In this case, Huminski does not suggest the buildings and grounds of the Vermont state court system, including the District Court in Rutland, are traditional public fora. Moreover, there is no evidence of a long history of public assembly and open debate in such places. The issue, therefore, is whether these state-owned and controlled properties are nonetheless subject to strict scrutiny because they are designated public fora. Again, the Second Circuit's recent opinion in Perry v. McDonald, supra, provides the relevant legal standard:
In order to determine whether a particular species of government property is a designated public forum, we examine factors such as the policy and practice of the government and the nature of the property and its compatibility with expressive activity. The focus of this analysis is on the government's intent; accordingly, a court must ascertain whether the government intended to designate a place not traditionally open to assembly and debate as a public forum ... bear[ing] in mind that the government creates a public forum by designating a place or channel of communication for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects. The government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening *538 a nontraditional forum for public discourse.
Id. at 167 (internal citations and quotations omitted).
For the reasons explained below, the Court concludes that Vermont state court buildings and grounds, including the District Court and parking lot in Rutland, are not designated public fora.[28]
First, Huminski does not expressly deny Corsones and Zimmerman's statement that "[t]he parking lot in which Mr. Huminski parked his van is intended for use for court staff and those going to court." Defs.' Statement of Facts (Paper 127), at ¶ 7; see Pl.'s Statement of Disputed Facts (Paper 134), at 2. Common sense dictates that state court buildings and their adjacent public parking lots are intended to further efficiency and administrative convenience, not create an open forum for assembly and debate.
Second, there is no evidence the State of Vermont or Defendants ever freely permitted all manner of political protests on state court buildings or grounds. Huminski's evidence that on prior occasions certain political protestsincluding those by Huminski himselfwere allowed to take place on state court lands such as the District Court in Bennington, is not sufficient proof of a government intention to create a forum for public discourse. See Gen. Media Communications, Inc. v. Cohen, 131 F.3d 273, 279 (2d Cir.1997) ("It is ... well established that the presence of some expressive activity in a forum does not, without more, render it a public forum."). Nor is it sufficient that Vermont courthouses and adjoining parking lots are freely open to all comers. See Greer v. Spock, 424 U.S. 828, 836, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976) (expressly rejecting the suggestion that "whenever members of the public are permitted freely to visit a place owned or operated by the Government, then that place becomes a `public forum' for purposes of the First Amendment"); United States v. Grace, 461 U.S. 171, 177, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983); Knolls Action Project v. Knolls Atomic Power Lab., 771 F.2d 46, 49 (2d Cir.1985).
Lastly, "examin[ing] `the nature of the property and its compatibility with expressive activity to discern the government's intent,'" McDonald, 280 F.3d at 168 (quoting Cornelius, 473 U.S. at 802, 105 S.Ct. 3439), there is a lack of compatibility between state courthouses, such as the District Court building in Rutland, and the sort of unfettered speech and assembly that occurs in traditional public forums. Unlike a park or street corner, the primary purpose of a courthouse is to fairly and effectively carry out adjudicatory business. An atmosphere of decorum and order is expected and enforced in a courthouse not for the sake of good manners; such an atmosphere facilitates the fair and efficient administration of justice. Cf. Dorfman v. Meiszner, 430 F.2d 558, 561 (7th Cir.1970) ("[T]he law not only allows but compels the courts to insure that judicial proceedings are conducted in an orderly, solemn environment free from the interferences which so often accompany modern news coverage of the events."); Claudio v. United States, 836 F.Supp. 1219, 1225 (E.D.N.C.1993) ("[T]he court perceives a legitimate interest by the Government in preserving a certain elevated level of decorum within (and upon) the walls of a building which houses federal judicial, executive, and administrative offices. Not every manner of expression is compatible with the ambiance of a government building.").
*539 Courthouse parking lots hardly fare better on the issue of compatibility, sinceas with the lot in Rutlandthey often abut courthouses. Indeed, in Cox v. Louisiana, 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965), the Supreme Court upheld the constitutionality of a law regulating protests in front of a courthouse on the basis of Louisiana's "legitimate interest in protecting its judicial system from the pressures which picketing near a courthouse might create." Id. at 562, 85 S.Ct. 476.[29]Cox undercuts the suggestion that state-owned lands immediately surrounding a courthouse are compatible with traditional free speech activities.
Lastly, like most parking lots, the one at issue contains marked spaces for automobiles, see Paper 131, Ex. 41, Attachs. A-C; id., Ex. 27, Attach. B, which not only indicates to persons entering from the street or sidewalk that they have "entered ... [a] special type of enclave," Kokinda, 497 U.S. at 728, 110 S.Ct. 3115, but also suggests the government does not intend to facilitate open public assembly or expression, cf. Grace, 461 U.S. at 183, 103 S.Ct. 1702.
In sum, the parking lot at the District Court is for the convenience of persons who are visiting the Court, and that purpose is not compatible with or suggestive of typical public form activities.

c. Nonpublic Forum: Viewpoint Neutrality and Reasonableness

"[T]he government may reasonably restrict expressive activity in a nonpublic forum on the basis of content, so long as the restriction is not `an effort to suppress the speaker's activity due to disagreement with the speaker's view.'" Cohen, 131 F.3d at 280 (quoting Int'l Soc'y for Krishna Consciousness, Inc. v. Lee, 505 U.S. 672, 679, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992)); see also Kokinda, 497 U.S. at 730, 110 S.Ct. 3115.

i. Viewpoint Neutrality

Content discrimination is permissible in a nonpublic forum: "Implicit in the concept of the nonpublic forum is the right to make distinctions in access on the basis of subject matter and speaker identity." Perry, 460 U.S. at 49, 103 S.Ct. 948. Viewpoint discrimination is illegal, however, in a nonpublic forum. See McDonald, 280 F.3d at 170; Cohen, 131 F.3d at 280.
"As a general matter, viewpoint discrimination represents a particularly `egregious' subset of content discrimination in which the `government targets not subject matter but particular views taken by speakers on a subject.'" Cohen, 131 F.3d at 281 (quoting Rosenberger v. Rector & Visitors of the Univ. of Va., 515 U.S. 819, 829, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995)). Thus, the distinction between content and viewpoint discrimination is "between `subject matter' (content) and `a specific premise, a perspective, a standpoint from which a variety of subjects may be discussed and considered.' (viewpoint)." Id. (quoting Rosenberger, 515 U.S. at 831, 115 S.Ct. 2510). As such, "Supreme Court decisions dealing with viewpoint discrimination evidence particular hostility to restrictions specifically intended to suppress the circulation of arguments on one side of a particular debate ... [while] laws that restrict the dissemination of defined kinds of expression for reasons that stop well short of suppression of speech are less likely to be found constitutionally offensive *540 on viewpoint grounds." Id. at 281 n. 10, 115 S.Ct. 2510 (emphasis added, citations omitted).
As noted above, there is a genuine dispute concerning the motivations behind Defendants' actions. If the Court were to adopt the Defendants' position, the trespass notices likely would pass muster as a regulation merely based on "a reason that stops well short of suppression of speech." It is insufficient, however, for Defendants to assert the trespass notices were facially viewpoint-neutral. There is some circumstantial evidence to support the conclusion that Defendants Corsones, Zimmerman, and Predom acted not simply because Huminski was protesting, or even because he was expressing political views generally, but because he was expressing a particular view (one highly critical) of Judge Corsones' judicial performance.

ii. "Clearly Established" Rights

The genuine factual dispute regarding Defendants' motivations prevents the Court from granting Defendants' motions for summary judgment under the second step of the qualified immunity test. It has long been "clearly established" that government officials may not discriminate against a speaker in a public or nonpublic forum based their disagreement with the speaker's viewpoint. See Lee, supra. It is clearly established that officials may not exercise their authority to retaliate against an individual on the basis of that individual's exercise of protected First Amendment rights. See Perry v. Sindermann, 408 U.S. 593, 597 (1972); City of Houston v. Hill, 482 U.S. 451, 462, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987); Sheppard v. Beerman, 94 F.3d 823, 828 (2d Cir.1996). But see Shechter v. Comptroller, 79 F.3d at 271 (right of "access to courts" does not meet the specificity requirements necessary to preclude qualified immunity defense).
Accordingly, the Court must deny the motions for summary judgment by Defendants Corsones, Zimmerman, and Predom with respect to Plaintiff's claims for monetary relief.[30]

iii. Reasonableness

Because speech regulations in a nonpublic forum must be both viewpoint-neutral and reasonable to survive constitutional scrutinythat is, a viewpoint-neutral speech regulation may be struck down for lack of reasonableness[31]the Court is required to make a determination as to the reasonableness of the trespass notices in order to rule on Plaintiff's summary judgment motion.[32]
"A governmental restriction on speech in a nonpublic forum `need only be reasonable in light of the purpose of the forum ... and reflect a legitimate government concern.'" McDonald, 280 F.3d at 169 (quoting Cohen, 131 F.3d at 282); see also Kokinda, 497 U.S. at 730, 110 S.Ct. 3115 ("`The Government's decision to restrict access to a nonpublic forum need only be reasonable; it need not be the most reasonable or the only reasonable limitation.'") (quoting Cornelius, 473 U.S. at 808, 105 S.Ct. 3439); United States v. Albertini, 472 U.S. 675, 689, 105 S.Ct. 2897, 86 L.Ed.2d 536 (1985) ("The validity *541 of [neutral governmental] regulations does not turn on a judge's agreement with the responsible decisionmaker concerning the most appropriate method for promoting significant government interests.") (citing Clark v. Community for Creative Non-Violence, 468 U.S. 288, 299, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984)). "`[A]n incidental burden on speech is ... permissible ..., so long as [it] promotes a substantial government interest that would be achieved less effectively absent the regulation.'" Rosenfeld v. Ketter, 820 F.2d 38, 41 (2d Cir.1987) (quoting Albertini, 472 U.S. at 689, 105 S.Ct. 2897).
Furthermore, "[i]f a restriction on speech in a nonpublic forum serves a legitimate governmental interest ... then the fact that the prohibited expression does not `interfere' with a principal purpose of the forum does not render that prohibition unconstitutional." McDonald, 280 F.3d at 169. Nor must the government prove that every manner or form of expressive activity is incompatible with the principal character and purpose of the government-owned facility in order to impose a total and complete ban on all forms of free speech activities. See Knolls Atomic, 771 F.2d at 50. As the Supreme Court has held:
The First Amendment does not bar application of a neutral regulation that incidentally burdens speech merely because a party contends that allowing an exception in the particular case will not threaten important governmental interests. Regulations that burden speech incidentally or control the time, place, and manner of expression must be evaluated in terms of their general effect.

Albertini, 472 U.S. at 688-89, 105 S.Ct. 2897 (citing Clark, 468 U.S. at 296-99 n. 8, 104 S.Ct. 3065) (emphasis added).
Applying these principles, and viewing the disputed material facts in Defendants' favor, the Court is persuaded the trespass notices are reasonable.
The primary purpose of state court facilities and their parking lots is the effective and fair administration of justice. As Defendants observe, a necessary condition to reaching that goal is a safe and orderly environment in and around the courthouse facilities. The trespass notices achieve Defendants' purported interest by excluding Huminski from all courthouse premises in Vermont, ensuring that he will not interfere or threaten courthouse security. In fact, the question of Defendants' motives notwithstanding, the trespass notices have the same general effectnamely, excluding Huminski from all state court propertyas if the State had implemented screening procedures barring all persons, except those bearing a government-issued identification, from entering state courthouses and parking lots.
Furthermore, the breadth of the trespass notices does not make them unreasonable; restrictions on speech in a nonpublic forum need not be narrowly-tailored, or even the most reasonable or best form of regulation. As long as they serve the purported government interest, they deserve judicial deference. See Albertini, 472 U.S. at 688-89, 105 S.Ct. 2897; Adderley v. Florida, 385 U.S. 39, 48 n. 7, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966) ("`The conduct which is the subject of this statutepicketing and paradingis subject to regulation even though intertwined with expression and association. The examples are many of the application by this Court of the principle that certain forms of conduct mixed with speech may be regulated.'") (quoting Cox v. Louisiana, 379 U.S. 536, 553, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965)).
Another factor bearing on reasonableness is the availability of alternative channels *542 of communication. See Cornelius, 473 U.S. at 809, 105 S.Ct. 3439 (direct mail and in-person solicitation outside the forum as alternatives); Perry, 103 S.Ct. 948 (bulletin boards, meeting facilities, and United States mail available as alternatives); Housing Works, Inc. v. Kerik, 283 F.3d 471, 481-82 (2d Cir.2002) (adjacent public park as alternative location to New York's City Hall Plaza for political protest regarding City's housing policies).
In this case, there are public sidewalks on two sides of the District Court building and grounds. See Paper 131, Ex. 27, Attach. B. In fact, the main entrance to the Court building faces one sidewalk, and the entrance to the parking lot transgresses another stretch of sidewalk. See id. "The First Amendment does not demand unrestricted access to a nonpublic forum merely because use of that forum may be the most efficient means of delivering the speaker's message." Cornelius, 473 U.S. at 809, 105 S.Ct. 3439. Thus, while attending court and protesting in the courthouse parking lot may be the most efficient way for Huminski to monitor judicial processes and communicate his views regarding Judge Corsones or other officials within the Vermont criminal justice system, there is nothing in the trespass orders that prevent him from communicating his views from the sidewalks to his intended audiencethose who come and go and conduct business in the District Court, including Corsones herself.
Finally, even were the Court mistaken on whether the trespass notices were reasonable, Plaintiff fails to demonstrate that a reasonable official in Defendants' positionand therefore concerned about security in light of Huminski's presence would have known that the notices against trespass were "clearly" unreasonable as a matter of law. In conclusion, therefore, Plaintiff's motion for summary judgment on his monetary claims must fail.

d. Defendant Elrick's Motion for Summary Judgment

Given that Sheriff Elrick did not see Huminski's protest signsand therefore could not have discriminated against Huminski on the basis of viewpointthe reasonableness of the trespass notices in light of the undisputed evidence warrants summary judgment in Elrick's favor. Furthermore, were the Court mistaken whether the regulation at issue was reasonable in light of undisputed facts, Plaintiff fails to demonstrate that a reasonable official in Elrick's positionnot aware of Huminski's viewpointwould have known that the trespass notices were "clearly" unreasonable as a matter of law. Elrick thus enjoys qualified immunity from Huminski's claim for damages.

2. Equitable Relief: Actual Success on the Merits

If no constitutional right is being violated by Defendants' conduct, there is no basis on which to grant equitable relief. See City of Los Angeles v. Lyons, 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983). However, if an ongoing constitutional violation is found, the doctrine of qualified immunity is no bar to the Court's power to grant equitable relief. See Charles W. v. Maul, 214 F.3d 350, 358 (2d Cir.2000).
In this case, disputed material facts regarding Defendants' motivations preclude the Court from determining whether the trespass notices constitute an ongoing deprivation of Huminski's First Amendment rights. Accordingly, the motions for summary judgment by Huminski, Corsones, Predom, and Zimmerman on Huminski's claims for declaratory and injunctive relief must be denied.
Given the genuine dispute as to material facts, however, the Court also finds there *543 is no reasonable likelihood that Huminski will actually succeed on the merits of his constitutional claim.[33] Thus, this Court's prior order of temporary injunctive relief (Paper 67) must be dissolved.

III. Conclusion

For the reasons set forth above:
the Court DISSOLVES its prior grant of preliminary injunctive relief (Paper 67);
the motion by Defendants Rutland County Sheriff's Department and Deputy Sheriff R.J. Elrick for summary judgment on all claims (Paper 123) is GRANTED;
the motion by Plaintiff Scott Huminski for summary judgment (Paper 120) is DENIED;
the motion by Defendant Karen Predom for summary judgment (Paper 128) is DENIED;[34]
the motion by Defendants Nancy Corsones and M. Patricia Zimmerman for summary judgment (Paper 125) is DENIED;
the motion by Defendants Rutland County Sheriff's Department and R.J. Elrick to strike Plaintiff's consolidated opposition memorandum (Paper 145) is DENIED;[35]
the motion by Plaintiff to strike portions of Defendants' Statements of Undisputed Material Fact (Paper 132) is DENIED;[36]
Plaintiff's claim for monetary relief under 42 U.S.C. § 1983 against Defendant Predom in her official capacity is dismissed, sua sponte, for lack of subject-matter jurisdiction; and
Plaintiff's state law claims against Defendants are dismissed, sua sponte, for lack of subject-matter jurisdiction.[37]
SO ORDERED.
NOTES
[1] Plaintiff also states a claim against each Defendant under the Vermont Constitution. As clarified below, the doctrine of state sovereign immunity deprives this Court of jurisdiction over all such supplemental state law claims.
[2] Huminski's complaint also names the Rutland County Sheriff's Department as a defendant and alleges Defendant R.J. Elrick, a deputy sheriff, was an employee of the Department. "[A] suit against a governmental officer `in his official capacity' is the same as a suit against the entity of which the officer is an agent[;] ... victory in such an `official capacity' suit imposes liability on the entity that the officer represents." McMillian v. Monroe County, 520 U.S. 781, 785 n. 2, 117 S.Ct. 1734, 138 L.Ed.2d 1 (1997) (internal citations and quotations omitted). Insofar as Huminski's complaint sues Elrick in his official capacity, therefore, the claim against the Sheriff's Department is redundant.
[3] The motion by Plaintiff (Paper 132) to strike portions of Defendants' Statements of Undisputed Material Fact is DENIED as moot. Except where noted, the Court finds the following undisputed facts to be sufficiently supported by the record.
[4] On appeal, Judge Corsones' ruling was reversed, and that reversal was later affirmed by the Vermont Supreme Court.
[5] The judicial conduct proceeding was not resolved as of May 24, 1999.
[6] Huminski's case was dismissed, however, and that dismissal was upheld by the Vermont Supreme Court. See Huminski v. Corsones, 777 A.2d 551 (Vt.2001) (affirming without opinion or memorandum decision).
[7] Corsones testified that the letters were not addressed to her personally, but instead mailed to the District Court in Bennington and brought to her attention by court staff.
[8] Corsones testified during her deposition that she never saw Huminski's van when he was protesting in the courthouse parking lot in Bennington. She also testified, however, that members of the court staff in Bennington informed her about Huminski's activities. In particular, court staff expressed their personal concern to Corsones that Huminski "hangs out [at the courthouse] a lot" and his frequent presence "spooked them." Paper 122, Ex. 2 (Corsones Dep. at 132).
[9] Regarding her decision to tell Predom that she would not take the bench unless Huminski left the District Court, Corsones later testified:

A: It was my decision to address the court security issues. It was very important for that to get addressed because I was not about to put anybody at potential risk in terms of starting another very complicated arraignment process with members of the public, the lawyers, the staff, and myself. So, I made the decision that we were not starting arraignments until the security issue is addressed.
Q: So, is it fair to say that you decided not to take the bench until after Mr. Huminski was ordered to leave the building?
A: I decided not to start arraignments until the security issue was addressed, and left [...] the decision to other people, the security people, the law enforcement folks, to make the decision on what to do.
Paper 127, Ex. 7 (Corsones Dep. at 249).
There is a genuine dispute whether Corsones also told Predom that: (1) she feared for her children's safety because of Huminski; (2) the court staff in Bennington had been concerned for their safety because of Huminski's frequent presence and behavior at the District Court; and (3) Huminski had written letters to Vermont officials regarding his case in which he appeared to make threats of violence.
[10] The Court draws no inference of discriminatory motive on Zimmerman's part from the sole fact that on prior occasions at the Family Court in Rutland, Zimmerman declined to issue a notice against trespass against a short-tempered and hostile litigant who appeared before her and later picketed outside the Family Court. The protests at the Family Court occurred on the public sidewalk in front of the Court, not on state property. Further, there is no evidence suggesting Zimmerman or any other judge ever received personal letters or faxes from the litigant complaining about the handling of a case. Finally, Zimmerman had not received a specific request by the chief administrative judicial officer in Vermont to issue such a notice with respect to the Family Court.
[11] The Court disagrees with Defendants' interpretation, based on a ruling of a lower state court, that the language in the notice merely restricts Huminski's access to the District Court building and grounds in Rutland. The proscription means what it plainly says: it applies to "[a]ll lands and property under control of the Supreme Court and the Commissioner of Buildings and General Services, including the Rutland District Court, parking areas, and lands." (Emphasis added). Cf. Vt.Stat.Ann. tit. 29, § 171(a)(1) (2000) ("[I]n those state-owned or state-leased buildings which house a court plus one or more other functions, security for the space occupied by the court shall be under the jurisdiction of the supreme court and security elsewhere shall be under the jurisdiction of the commissioner of buildings and general services[.]"). To borrow from Sheriff Elrick's deposition testimony, the May 27, 1999 notice was more "global" in its scope of applicability than the first notice. Paper 122, Ex. 9 (Elrick Dep. at 42).
[12] The Court cannot say that a reasonable jury could not find that Huminski's letters contained a threat, or at least expressed an intent to create some type of disturbance. As the Second Circuit has repeatedly noted in the context of prosecutions for alleged threats against federal governmental officials, whether words used are a true threat within the meaning of the law is often a question for the trier of fact. See, e.g., United States v. Amor, 24 F.3d 432, 436 (2d Cir.1994) (prosecution under 18 U.S.C. § 1513); United States v. Malik, 16 F.3d 45, 51 (2d Cir.1994) (prosecution under 18 U.S.C. § 876); United States v. Carrier, 672 F.2d 300, 306 (2d Cir.1982) (prosecution under 18 U.S.C. § 871).
[13] It is irrelevant that Polk's recommendation was based in part on the apparently erroneous report given by Predom, namely, that the windows of the van were obstructed or "blacked-out." Corsones did not testify to having seen the van that morning and she had no reason to discount the judgement of Polk, an individual with far more experience and training on matters of courthouse security.
[14] For the purposes of resolving Plaintiff's motion against Predom, the Court must also accept that Corsones told Predom that: (1) Corsones feared for her children's safety because of Huminski; (2) the court staff in Bennington had been concerned for their safety because of Huminski's protests; and (3) Huminski had written letters to Vermont officials regarding his case in which he appeared to make threats.
[15] There is no requirement for Zimmerman to have independently inquired of Huminski's past behavior in order to hold a belief that Huminski posed a security risk.
[16] There is no evidence in the record that Elrick knew the viewpoint espoused by Huminski on May 24 or any other date. As discussed below, this is an important factor in granting summary judgment in Elrick's favor.
[17] Zimmerman and Elrick signed the second notice knowing that Huminski was nowhere near state-owned property. In fact, Huminski was fully complying with the May 24 notice, and sent his wife to the District Court in Rutland on May 25 in order to file papers requesting the retraction of the notice against trespass.
[18] There is no support for Predom's suggestion that the initial notice was legally superceded or voided by virtue of the second trespass notice.
[19] State sovereign immunity is a bar on federal subject-matter jurisdiction, which the Court may raise sua sponte. See McGinty v. New York, 251 F.3d 84, 90 (2d Cir.2001).
[20] By implication, if Elrick is not liable in his official capacity, then his officethe Rutland County Sheriff's Departmentcannot be liable. See note 2, supra.
[21] Personal capacity suits under § 1983 "seek to impose individual liability upon a government officer for actions taken under color of law." Hafer v. Melo, 502 U.S. 21, 25, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991). The Court finds no support for Plaintiff's contention that the Court ordered this lawsuit bifurcated, such that the question of Defendants' liability for damages in their personal capacities is not currently before the Court. Moreover, because Defendants move for summary judgment on grounds of qualified immunity, the question whether Defendants are personally liable for damages is clearly before the Court at this stage. See Saucier v. Katz, 533 U.S. 194, 200-01, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).
[22] Inasmuch as "[a] suit against a state official in his or her official capacity is not a suit against the official but rather a suit against the official's office," Will v. Michigan Dep't of State Police, 491 U.S. 58, 67, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989), Huminski's requests for injunctive and declaratory relief against Defendants Corsones, Zimmerman, and Predom should be understood as a request for relief against the Vermont Supreme Court, which is charged with the duty of administering the Vermont court system.
[23] Corsones and Zimmerman cite Barrett v. Harrington, 130 F.3d 246 (6th Cir.1997), to contend their actions were judicial in nature. In Barrett, the Sixth Circuit found judicial immunity precluded a suit against a judge who wrote a letter to prosecutors in order to prompt a criminal investigation of a litigant's allegedly threatening and obstructive conduct. However, the Sixth Circuit's holding depended heavily on its finding that the defendant judge had well-founded reasons for taking the actions for which the court found she enjoyed judicial immunity. See id. at 259. Because the judicial immunity inquiry focuses on the nature of the challenged action, see Stump, supra, and not the reasons or motives (however worthy or unworthy) for such actions, this Court declines to follow the Sixth Circuit by making the judicial immunity inquiry into a question of reasonableness or motive. Just as a judicial act "does not become less judicial by virtue of an allegation of malice or corruption of motive," Forrester v. White, 484 U.S. 219, 227, 108 S.Ct. 538, 98 L.Ed.2d 555 (1988), an act that is not judicial in nature when viewed abstractly does not become more judicial because a judge demonstrates the act was reasonable or justified.
[24] The involvement of Judge McCaffrey in Judge Zimmerman's decision to sign the trespass notice, however, highlights a relevant distinction. Under Second Circuit precedent, non-judicial court officers, including clerks and other court staff, may enjoy absolute judicial immunity for performance of tasks which are administrative in nature, so long as such tasks are an integral part of the judicial process and are undertaken pursuant to an established court policy or the explicit direction of a higher-ranking judicial officer. See Rodriguez v. Weprin, 116 F.3d 62, 67 (2d Cir.1997). Assuming this rule applies to judicial officers when they act under the direction of administrative judges, Judge Zimmerman does not benefit from this rule because there is no evidence the issuance of the trespass notice to Huminski was "integral" to the functioning of the judicial processes at the District Court in Rutland, much less throughout Vermont.
[25] "`The standard for a permanent injunction is essentially the same as for a preliminary injunction with the exception that the moving party must show actual success on the merits.'" Am. Booksellers Found. For Free Expression v. Dean, 202 F.Supp.2d 300, 321 (D.Vt. 2002) (quoting Housing Works, Inc. v. Safir, 101 F.Supp.2d 163, 167 (S.D.N.Y.2000), rev'd on other grounds sub nom. Housing Works, Inc. v. Kerik, 283 F.3d 471 (2d Cir.2002)).
[26] Qualified immunity is "an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." Saucier, 533 U.S. at 200-01, 121 S.Ct. 2151. "As a result," the Supreme Court has " `repeatedly ... stressed the importance of resolving immunity questions at the earliest possible stage in litigation.'" Id. at 201, 121 S.Ct. 2151 (quoting Hunter v. Bryant, 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991)). Accordingly, and because Defendants currently seek summary judgment on qualified immunity grounds against Plaintiff's claims for monetary relief, the Court rejects Plaintiff's contention that the Court must defer resolving the question of qualified immunity.
[27] In addition to expressly claiming First Amendment violations, Count One of Plaintiff's Amended Complaint alleges "denial of equal protection" under the Fourteenth Amendment. See Paper 66, at 10-11. Throughout Plaintiff's memoranda filed in support of his motion and in opposition to Defendants' motions, however, not a single Equal Protection Clause argument or case is advanced or cited. Plaintiff instead relies on cases involving viewpoint or content-based discrimination, or retaliation claims under the First Amendment. Plaintiff repeatedly emphasizes that the case presents a single "straightforward issue" concerning his "First Amendment right to free expression." See, e.g., Papers 122 & 148, at 1. Further, it is far from clear whether in this case a meaningful distinction exists between Plaintiff's First Amendment and Equal Protection Clause claims. See Anderson v. Treadwell, 294 F.3d 453, 464-65 (2d Cir.2002); African Trade & Info. Ctr., Inc. v. Abromaitis, 294 F.3d 355, 362-64 (2d Cir.2002). As such, and for the sake of clarity, the Court construes Plaintiff's claims to be based solely on the First Amendment.
[28] For purposes of the forum analysis, there is no indication the other State court buildings and adjoining grounds differ significantly from the District Court facility in Rutland.
[29] Thus, to prevent "influence or domination by either a hostile or friendly mob," the Cox Court declared that, "[a] State may adopt safeguards necessary and appropriate to assure that the administration of justice at all stages is free from outside control and influence." 379 U.S. at 562, 85 S.Ct. 476 (emphasis added).
[30] It is undisputed, however, that Elrick was not aware of the views expressed by Huminski. For this and other reasons discussed below, summary judgment must be granted in Elrick's favor.
[31] See, e.g., Vasquez v. Housing Auth. of City of El Paso, 271 F.3d 198 (5th Cir.2001).
[32] In ruling on Plaintiff's motion, the Court is required to accept that Defendants' actions were viewpoint-neutral. The necessary remaining question, therefore, is whether the trespass notices were also reasonable.
[33] See Huminski v. Rutland County, 148 F.Supp.2d 373, 376 n. 2 (2001) (Paper 73) (observing that "credible allegations of potential harm or injury would ... weigh[] strongly against the issuance of the preliminary injunction").
[34] Insofar as Defendant Predom's motion also sought to dissolve the Court's prior grant of preliminary injunctive relief, Predom's motion is GRANTED IN PART and DENIED IN PART.
[35] Plaintiff's 67-page Consolidated Opposition memorandum was filed in response to three separate motions for summary judgment brought by three sets of defendants, thus falling within this Court's 25-page limitation on memoranda filed in response to a dispositive motion. See Local Rule 7.1(a)(4).
[36] See note 3, supra.
[37] Given the above rulings, the following issues remain undecided: claims for monetary relief (damages) against Defendants Corsones, Zimmerman, and Predom in their personal capacities for past violations of federal law, and claims for declaratory and injunctive relief against those same Defendants in their official capacities for ongoing violations of federal law.