**UNITED STATES of America, Appellee–Cross–Appellant,**

**v.**

**Salomon AMOR, Defendant–Appellant–Cross–Appellee.**

**Nos. 1105, 1445, Dockets 93–1491, 93–1579.**

United States Court of Appeals, Second Circuit.

Argued March 1, 1994.

Decided May 17, 1994.

Elizabeth S. Riker, Asst. U.S. Atty., Syracuse, N.Y. (Gary L. Sharpe, U.S. Atty., for the N.D.N.Y., on the brief), for appellee-cross-appellant.

Michael D. Pinnisi, Ithaca, NY, for defendant-appellant-cross-appellee.

Before: KEARSE and LEVAL, Circuit Judges, and POLLACK, District Judge*.

KEARSE, Circuit Judge:

Defendant Salomon Amor appeals from a judgment entered in the United States District Court for the Northern District of New York after a jury trial before Neal P. McCurn, *Judge*, convicting him on one count each of making, possessing, and failing to register a sawed-off rifle, in violation of, respectively, 26 U.S.C. § 5861(f), (c), and (d) (1988) (counts 1–3), and on one count of retaliation against a government informant, in violation of 18 U.S.C. § 1513(a)(2) (1988) (count 4). He was sentenced principally to 30 months' imprisonment, to be followed by a two-year term of supervised release. On appeal, Amor contends that he is entitled to a judgment of acquittal (a) on the firearm counts on the ground of entrapment, and (b) on the retaliation count on the ground of insufficiency of the evidence. He also contends that he was unfairly prejudiced at trial by the admission of evidence suggesting that he may have been dealing in narcotics. The government has cross-appealed, contending that the 30–month sentence was an impermissible departure from the 46–57–month imprisonment range prescribed by the federal Sentencing Guidelines ("Guidelines"). For the reasons below, we reject both sides' contentions and affirm the judgment.

---

* Honorable Milton Pollack, of the United States District Court for the Southern District of New York, sitting by designation.

## I. BACKGROUND

In 1992, Amor was employed by Flower City Glass, an automobile glazier operating in Rochester and Syracuse, New York. As manager of the company's field operations, Amor was responsible for, *inter alia,* running the company's production shops during employee strikes. Most of the events at issue here took place in the company's Syracuse shop. The evidence at trial, taken in the light most favorable to the government, revealed the following.

In the spring of 1992, Amor asked coworkers, including William McAleese, where he could buy a handgun. Amor said a deal had gone sour and there was someone with whom he wanted to get even. McAleese reported the conversation to shop manager Peter Obit, and the two went to the police.

Police Investigator Mark Petterelli suggested an undercover meeting with Amor and contacted the Bureau of Alcohol, Tobacco and Firearms ("BATF") for assistance. McAleese agreed to act as a go-between. Although thereafter Amor, accompanied by McAleese, had one meeting with an undercover BATF agent, the agent did not have a handgun to sell him, and further attempts to arrange another meeting were unsuccessful.

On May 27, Amor called the shop and stated that his car had been shot up the night before while parked outside his home, and a threatening note had been left on it. When Amor arrived at the shop, he and Obit called Richard Gianforti, the owner of the company, and reported the incident. Amor opined that the perpetrators were union workers anticipating a strike and suggested that he needed a gun for protection. Though Gianforti agreed, he warned Amor not to get a handgun since Amor did not have a pistol permit. Gianforti suggested that he get a rifle or shotgun and told Obit to assist Amor in any way possible. Obit offered to lend Amor a shotgun to keep in his apartment for protection.

On the following day, Obit brought his shotgun to work for Amor. Amor stated that it was too big and he wanted to cut it down. Obit vetoed the idea. Amor then asked Obit if he knew where he could buy a shotgun.

Obit referred him to a sporting goods store a mile away, and Amor asked Obit to drive him there. Following repeated urging by Amor through most of the day, Obit drove him to the store. After looking at shotguns, Amor ultimately purchased a rifle.

In the meantime, McAleese, who had been away from the shop, returned and learned that Amor was considering purchasing a shotgun. He so informed Petterelli, who asked McAleese to let him know if Amor did in fact obtain a gun. After Amor returned with his newly-purchased rifle, he told his coworkers that he intended to cut the barrel. Toward the end of the day, Amor asked Obit where he could find a metal-cutting blade. Obit told him, and Amor set up the blade on the shop saw. He then asked McAleese to assist him in cutting the gun's barrel and its stock. McAleese complied and then left the shop; he testified that he knew cutting the gun barrel was unlawful, but that he intended to, and did, call Petterelli to report as soon as he left.

Obit, who had responsibility for locking up the shop at the end of the day, had waited while Amor cut and ground down the barrel. Before Amor had finished sanding the barrel of the gun, however, he received a telephone call. While Amor was talking on the phone, Obit, in a hurry to leave in order to coach his son's soccer practice, finished sanding the barrel. After Amor concluded his telephone call, he refused to leave until he had tested the gun, firing 30–50 rounds at random in the shop and through its back door into a public parking lot.

In the meantime, McAleese had reported Amor's rifle-alteration activities to Petterelli. McAleese gave the police a written statement and informed them that Obit too had been a witness. The police then persuaded Obit to come to the police station and make a statement. He reported orally what he had witnessed, but, fearing reprisal from Amor, Obit refused to sign a written statement until the BATF agent assured him of protection. The police obtained a search warrant for Amor's apartment and there found the sawed-off rifle in a closet, fully loaded. Amor was arrested, charged with the three firearm offenses indicated above, *i.e.,* making, possess-

ing, and failing to register a sawed-off rifle, in violation of 26 U.S.C. § 5861(f), (c), and (d), respectively, and was released on bail.

When Amor returned to work, he repeatedly told Obit he would find out who had informed the police and "get even with" the informant. Obit eventually decided to admit to Amor that he had spoken to the police and to record the conversation in case Amor threatened him. However, in that conversation, Amor misunderstood what Obit was saying and thought Obit meant he had talked to the police after Amor's arrest, not before. His tone with Obit was nonetheless strongly reproachful, and Obit was afraid to tell Amor he had been one of the informants. As Amor repeatedly spoke of what he would do to the informant when he learned the informant's identity, Obit became increasingly concerned, especially when he learned that the government would have to turn his statement over to Amor. In order to obtain police protection, Obit taped additional conversations with Amor, in which Amor indicated that when the informant's identity was learned, Amor would "take care of" him in such a way that the informant would thereafter be unable to talk. Amor said he would have someone else do the deed while Amor had an alibi. Obit turned two tapes over to the police and asked for protection. However, no action was taken because Amor's threats had not been directed against an identified person.

Eventually, Amor asked Obit if Obit had talked to the police prior to Amor's arrest, and Obit admitted that he had. Amor reacted angrily, yelling that Obit would pay for having informed the police. During the next two days, Obit received reports from at least four of his coworkers that Amor had been voicing threats toward Obit and Obit's family. For example, Amor told McAleese, whom Amor did not then suspect of being an informant, that Obit had been the informant and that Amor had been thinking of ways to "get" Obit. Amor raved that he would burn down Obit's house, kill his family, cut him up, and listen to him scream. McAleese testified that Amor sounded "quite serious." Amor told another coworker that he wanted to cut off Obit's fingers and toes. Beverly Austin, one of the company's secretaries, testified

that Amor "was very angry when he found out that Peter [Obit] had made the statement, he felt Peter had betrayed him, that he had F'd [sic] him." Amor made several telephone calls in her presence, and in each conversation, he described with specificity his desire to subject Obit to a thorough castration. Austin was sufficiently concerned by Amor's words and his tone that she kept notes of his statements and reported them to Obit and McAleese.

Obit testified that he and his family were frightened by the threats and began locking their doors and windows. Obit asked Austin to tell Gianforti of the threats; she did so, and Gianforti instructed Amor to stay away from the Syracuse office. McAleese reported the threats to the police, who rearrested Amor and had his bail revoked. Amor was charged with threatening retaliation against Obit, in violation of 18 U.S.C. § 1513.

Amor testified at trial and claimed entrapment on the firearm counts. He testified, *inter alia,* that Obit and McAleese had instigated his acquisition of the rifle, spending weeks persuading him that he needed a gun to protect himself from the union, and that Obit and McAleese had persuaded him to cut the rifle down. Amor also denied making any threats of injury against Obit or his family, saying that his words were merely "a way of speaking." He also testified that when he said Obit would "pay" for informing, he meant that Obit would be required to reimburse Amor for his attorney's fees. On cross-examination, Amor admitted that he himself had approached at least one other coworker in an effort to obtain a handgun illegally; and he admitted that he had stated he wished to castrate Obit, though he insisted that this was not a threat of physical injury.

The jury found Amor guilty of all four of the offenses with which he was charged. As discussed in Part III below, Amor was sentenced principally to 30 months' imprisonment, to be followed by a two-year term of supervised release.

This appeal and cross-appeal followed.

## II. AMOR'S APPEAL

On his appeal, Amor contends (a) that he was entitled as a matter of law to be acquitted on the firearm counts on the ground of entrapment, (b) that he was entitled to acquittal on the retaliation count because his threats were not sufficiently credible to support a conviction, and (c) that the admission of evidence concerning drug offenses deprived him of a fair trial. All of these contentions lack merit.

### A. *The Sufficiency and Entrapment Arguments*

■ Amor contends that his allegedly threatening statements (a) were not meant to be threats, and (b) were not taken seriously as threats, and that therefore they were legally insufficient to constitute threats within the meaning of 18 U.S.C. § 1513. These contentions find no support in the law or in the evidence.

■ Section 1513 provides, in pertinent part, that it is unlawful for any person to "threaten to"

knowingly engage[ ] in any conduct and thereby cause[ ] bodily injury to another person or damage[ ] the tangible property of another person, . . . with intent to retaliate against any person for—

. . . .

(2) any information relating to the commission or possible commission of a Federal offense . . . given by a person to a law enforcement officer.

18 U.S.C. § 1513(a)(2). In a prosecution for such threats, "whether the statements made and acts engaged in amount to threatening conduct is a question of fact for the jury." *United States v. Paradis,* 802 F.2d 553, 563 (1st Cir.1986); *see also United States v. Carrier,* 672 F.2d 300, 306 (2d Cir.) (in prosecution under 18 U.S.C. § 871 for threat against President of the United States, "whether words used are a true threat is generally best left to the triers of fact"), *cert. denied,* 457 U.S. 1139, 102 S.Ct. 2972, 73 L.Ed.2d 1359 (1982).

Here, the government's evidence was more than sufficient to require the submission of the § 1513 count to the jury. When Amor learned that Obit had been an informant, he accosted Obit angrily and said he would make Obit pay; he told several coworkers, *inter alia,* that he would "get" Obit, cut him till he screamed, and castrate him. The coworkers testified that Amor sounded serious; they were sufficiently alarmed to report the statements to Obit; McAleese was sufficiently concerned to report the statements to the police. Whether Amor was serious as he seemed at the time or speaking in hyperbole as he contended at trial was a matter for the jury to decide. The evidence was ample to permit a rational juror to find beyond a reasonable doubt that Amor meant his words as threats and that they were so perceived. Amor was not entitled to a judgment of acquittal on the § 1513 count as a matter of law.

■ Amor's contention that he was entitled to acquittal as a matter of law on the firearm counts on the ground of entrapment does not warrant extended discussion. Though Amor testified that his acquisition of a gun was the idea of Obit and McAleese who pressed it on him, and that it was they who urged him to cut down the rifle, the testimony of Obit and McAleese was to the contrary. Further, Amor admitted that he had approached at least one other coworker about procuring a gun illegally. Where there are conflicts in the testimony, their resolution is for the jury. The jury chose to believe the accounts of Obit, McAleese, and the other government witnesses, rather than the account of Amor. We see no basis on which to disturb its credibility assessments.

### B. *The Narcotics Evidence*

■ Amor contends that at trial, the government improperly introduced evidence of possible narcotics dealing by Amor. He maintains that the subject was introduced in a nonresponsive answer by BATF undercover agent Francis Neeley to the question whether he had planned to sell Amor a gun for cash. Neeley answered:

Based on the information I obtained prior to meeting with the subject, we had information the subject was involved in or allegedly involved in narcotics trafficking and

therefore, we examined the possibility of possibly making an exchange of narcotics for a drug—for, excuse me, for a gun, initially.

(Trial Transcript ("Tr.") at 128–29.) During Neeley's testimony, the government also introduced a tape recording of the conversation between Amor and Neeley, which included the following exchange:

Neeley: Listen, I make my money on guns and I deal a little in some drugs—

Amor: I carry a lot of shit with me that's why I need a gun.

Neeley: Okay. All right. You know, [McAleese] told me basically that he doesn't know what you're into but [—]

Amor: What kind of drugs do you carry[?]

Neeley: Predominantly coke[.]

Amor: Coke?

Neeley: Is what I'm pretty much dealing with[.]

Amor: What's for an eight?

Neeley: What's that?

Amor: What's for an eight?

Neeley: Well it depends on how well I know you. Why, you planning on selling or buying?

Amor: Let's talk.

Neeley: Ah, I've never dealt with you before[.] [L]et's do some guns first and actually right now my thing is this.

Amor: You got any coke on you?

Though Amor eventually moved for a mistrial, he had not moved to strike the answer he contends introduced the subject of narcotics. Nor had he objected to the introduction of the above tape recording. On this appeal, he contends that the admission of the narcotics-related evidence constituted "plain error" and warrants reversal even in the absence of objection. His contention is meritless.

The record indicates that the subject of narcotics was first raised at trial not by the government but by Amor. Prior to the testimony of Neeley to which Amor now objects, the government had called Petterelli as a witness. Amor's counsel, in cross-examining Petterelli asked, *inter alia*, "you and Neeley discussed selling Mr. Amor a handgun in

exchange for cocaine, isn't that right?" (Tr. 62.) The government, which had not elicited any mention of narcotics by Petterelli on its direct examination, objected, and its objection was overruled. Amor's counsel then repeatedly pursued the matter, asking Petterelli whether either Obit or McAleese had "claimed that Mr. Amor had been deported from other countries for drug dealing" (Tr. 87); whether any documents provided by the immigration authorities contained "[a]ny information ... about Mr. Amor being deported from any countries for drug dealing" (Tr. 88); and whether "anything in what [Petterelli] reviewed ... suggested that Mr. Amor was deported from any country for drug dealing" (Tr. 89).

Accordingly, the subject of narcotics dealing was first raised by Amor himself, and he cannot now complain that the unobjected-to evidence introduced by the government was error, much less "plain" error.

## III. THE GOVERNMENT'S CROSS–APPEAL

The Guidelines require that the offense level for a defendant convicted of multiple offenses be calculated by grouping the offenses, *see* Guidelines § 3D1.2(c), and that the offense level applicable to the group be that for the most serious of the offenses in the group, *see id.* § 3D1.3(a). Since Amor's retaliation offense was more serious than the firearm offenses, the offense level for count 4 was controlling. To the extent pertinent to the government's cross-appeal, these principles resulted in an offense level for Amor of 23, and a recommended imprisonment range of 46 to 57 months.

Amor moved for a downward departure from that range under Guidelines § 5K2.12, which provides, in pertinent part, as follows:

If the defendant committed the offense because of serious coercion, blackmail or duress, under circumstances not amounting to a complete defense, the court may decrease the sentence below the applicable guideline range. The extent of the decrease ordinarily should depend on the reasonableness of the defendant's actions and on the extent to which the conduct

would have been less harmful under the circumstances as the defendant believed them to be. Ordinarily coercion will be sufficiently serious to warrant departure only when it involves a threat of physical injury, substantial damage to property or similar injury resulting from the unlawful action of a third party or from a natural emergency. . . .

Guidelines § 5K2.12. Amor's attorney argued that Amor's offenses were occasioned by duress resulting from receiving threats and having his car shot up, and that these circumstances, though not sufficient to constitute a defense to the charges, were sufficient to warrant a downward departure. The government objected on the ground that Amor's offense level was controlled by the retaliation count, and that duress had no bearing on that count because nothing had impelled Amor to threaten Obit.

The district court concluded that the case was unique and that the retaliation threats, though reprehensible, could not be considered in a vacuum. Considering the circumstances of the case as a whole rather than piecemeal, the court concluded that the appropriate sentence would include a departure to 30 months' imprisonment. The court stated as follows:

> THE COURT: All right. Well, I've given this latter point, this motion by [Amor's attorney], a lot of consideration. This is a rather unique case I think. And I realize the point that the government makes is well-taken, but what I have to really consider is what duress there was in connection with the retaliation threats he was making. But I don't think that you can consider this in a vacuum, that the court has to take into consideration all of the facts which were brought to trial before the court. The jury determined that under the law he wasn't entrapped but I think this particular section which allows the court to depart under certain circumstances gives the court that power in the event that the facts don't support enough to find an entrapment. That's the purpose for the section, for a court to utilize some equity or justice.

> MS. RIKER [Assistant United States Attorney]: I agree with that, your Honor, but the government wants to go on record that it does not believe that the duress adjustment should be applied where you have a case where the defendant is convicted of aggression toward others and it's undisputed that there was no aggression toward him.

> THE COURT: Well, the sentence called for under the guidelines for a conviction of this particular statute is a substantial one. The court has taken all these factors into consideration. The court finds that the defense counsel's motion for a downward departure under U.S.S.G. 5K2.12 for coercion and duress has merit and the court accordingly will depart. The court believes that the defendant may have purchased the rifle in fear for his physical safety, especially in response to the incident where his vehicle was shot up and a threatening note left behind.

> I want to make clear, though, that the court in no way by this finding excuses the defendant's serious misconduct in altering the rifle and later retaliating against Mr. Obit. The court intends to impose a significant punishment for these offenses but will depart downward.

(Sentencing Transcript, June 23, 1993, 17–18.) The court went on to state that

> [t]his sentence represents a downward departure from the guideline range under U.S.S.G. Section 5K2.12 by motion of defense counsel. The court finds the defendant committed the offense at least in part because of coercion and duress. There is reason to believe that the defendant was fearful of potential violence on the part of the union in an impending strike. In addition, his car was shot up and he was threatened with violence to his person just prior to his purchase of the firearm. The conduct of his coworkers may also have contributed to his state of mind at the time the weapon offense was committed.

> . . . . With all factors being considered, the court finds the sentence imposed to be appropriate.

(*Id.* 19–20.)

■ The Sentencing Reform Act, pursuant to which the Guidelines were promulgated, provides that in reviewing a sentence,

[t]he court of appeals shall give due regard to the opportunity of the district court to judge the credibility of the witnesses, and shall accept the findings of fact of the district court unless they are clearly erroneous and shall give due deference to the district court's application of the guidelines to the facts.

18 U.S.C. § 3742(e) (1988). "[A] sentencing court's use of an invalid departure ground [would be] an incorrect application of the Guidelines." *Williams v. United States,* — U.S. —, —, 112 S.Ct. 1112, 1119, 117 L.Ed.2d 341 (1992).

As indicated above, § 5K2.12 permits a departure if the defendant "committed the *offense because of*" duress. (Emphasis added.) The government contends that the downward departure for Amor was impermissible, arguing principally (a) that "offense" as used in § 5K2.12 should be interpreted as referring only to the offense that controlled a defendant's offense level for his entire group of offenses, (b) that Amor's controlling offense was the retaliation offense, and (c) that such duress as existed related only to the firearm offenses, not to the retaliation offense. The government argues that any other interpretation would create an anomalous result because in a case such as this one, a defendant could receive a lower sentence when charged on all possible counts, as to some of which there may have been duress, than he would if charged only with the retaliation count, as to which there was no duress. While the government's argument has surface appeal, we reject it, because we believe it adopts too narrow a view of what it means for an offense to be committed "because of" duress for the purposes of § 5K2.12.

The government's argument presumes that an offense is committed "because of" duress only when the duress leads *directly* to the offense. The district court, however, adopted a broader view of causation. While the court recognized that it must consider "what duress there was in connection with the retaliation threats [Amor] was making," it found that it could not consider that question "in a vacuum." The court observed that Amor had been under duress from the violence done to his car and the threatening note left for him just prior to his purchase of the gun, and it concluded that, in this "rather unique" case, Amor's conduct was attributable in part to duress. Thus, it is apparent that the district court concluded that it should view Amor's conduct as a chain of events, and that although the events in the chain were not wholly caused by duress, if Amor had not been under duress at the outset, none of the events in the chain, including the retaliation, would have occurred.

We cannot say that the sentencing court's finding that the retaliation was committed in part "because of" duress is clearly erroneous. The evidence was sufficient to support the finding that Amor had received a clear threat of physical injury and substantial property damage from the unlawful actions of unidentified parties. While not enough to excuse Amor's conduct, the nexus between that clear threat and Amor's ensuing acquisition of the gun is sufficient to support the district court's conclusion that duress played an important part in setting in motion the events that led to Amor's conviction.

More importantly, the relationship between the gun acquisition and the threats was close enough that it was fair for the court to conclude that there was a causal nexus between the original duress and the eventual threats of retaliation. Nor do we see any anomaly in this conclusion, since even if the government had brought only the retaliation charge, Amor could still have moved for a downward departure on the basis that the chain of events leading to the retaliation conviction happened in large part because of duress. We emphasize that we would be skeptical of the application of § 5K2.12 to circumstances in which the offenses of conviction were not so interrelated, as would be true, for example, if Amor unlawfully obtained the gun under duress but threatened Obit for informing the police about some unrelated offense, for example, Amor's suspected narcotics trafficking. In that hypothetical circumstance, we would think the necessary causal link between offenses would be lacking and that the court could not find a chain sufficient to conclude that the retaliation was committed "because

of" the duress. Here, however, the district court permissibly found that there was a causally related chain of circumstances, and we conclude that the court's application of § 5K2.12 to that chain was reasonable and is entitled to deference. We therefore reject the government's cross-appeal.

## CONCLUSION

We have considered all of the arguments made by the parties in support of their respective appeals and have found no basis for reversal. The judgment of the district court is affirmed.