**UNITED STATES of America,**

v.

**Jessica BEAL, Defendant.**

No. CR–04–58–B–W.

United States District Court, D. Maine.

Jan. 19, 2005.

James L. McCarthy, Office of the U.S. Attorney, District of Maine, Bangor, ME, Plaintiff.

Brett D. Baber, Law Office of Brett D. Baber, Hancock Place, Bangor, ME, for Defendant.

### ORDER DENYING DEFENDANT'S MOTION FOR A DOWNWARD DEPARTURE

WOODCOCK, District Judge.

Defendant Jessica Beal's husband is a drug addict. Living with him, raising their young child,[1] and making enough money to support both their family and his habit has been hard. When his demand for Oxycontin exceeded their income, Mr. Beal harassed his wife for money and Ms. Beal looked for other sources. Unfortunately, she chose to steal $47,000.00 from her employer, Union Trust Company. Claiming she embezzled the money because her husband and his drug dealer coerced her, she urges this Court to depart downward under U.S.S.G. § 5K2.12, Coercion and Duress.[2] This Court DENIES the Defendant's Motion for Downward De-

parture, because she failed to sustain her burden to demonstrate she committed the crime due to coercion and duress.

## I. STATEMENT OF FACTS

### A. Jessica Beal

Jessica Beal, twenty-three years old, is a resident of Milbridge, Maine. She grew up in Washington County, Maine, having been graduated from Narraguagus High School in 1999. During high school, when she was sixteen, she met Donald Beal. They were married on September 21, 2002, and now have two children, ages four and six months. After high school, Ms. Beal worked various jobs until 2000, when she became employed as a traveling teller at Union Trust Company, working in four of the bank's branches. In September 2002, she became a vault teller at the Cherryfield branch, gaining access to large amounts of cash and entrusted to account for it.

### B. Donald Beal

A lobster fisherman, Donald Beal grew up in the Maine coastal town of Jonesport. Sometime during the year 2002, Mr. Beal became addicted to Oxycontin and his addiction gradually grew. From September 2002, when they were married, until June 2003, when Mr. Beal entered a drug rehabilitation program, his daily Oxycontin purchases ballooned from $60.00 to $250.00 per day.

### C. The Financial Crunch

Mr. Beal's need for drug money quickly exceeded the young couple's resources. As a lobster fisherman, Mr. Beal earned

---

1. The Beals now have two children, ages four and six months; at the time of the embezzlement, they had only one child.

2. Under *United States v. Booker*, —— U.S. ——, at ——, 125 S.Ct. 738, 766–67, —— L.Ed.2d ——, at —— (2005), although not bound to apply the Guidelines, the sentencing court must "consult those Guidelines and take them into account when sentencing."

about $30,000.00 per year, but lobstering is a seasonal affair, running generally from April to December each year. During the Maine winter, the lobstering income stopped, but Mr. Beal's addiction did not. As a Union Trust teller, Ms. Beal was earning about $8.00 per hour, roughly $17,000.00 per year. The math did not work. The Beals' annual income of roughly $47,000.00 could not sustain the cost of Mr. Beal's habit, which was exceeding $90,000.00 per year.

There were other expenses. The Beals had bought a house for $50,000.00 and had a $41,000.00 mortgage with a monthly payment of $379.00. Then, there was the regular cost of running a household. They began to fall behind: Ms. Beal's credit card was charged to the limit; they fell behind in their mortgage payments; and the IRS placed a lien on their home. Ms. Beal began to borrow from her family. Her mother, Jennifer Strout, testified it seemed Jessica and Donald were "forever needing money." Ms. Beal borrowed $200.00 to $300.00 at a time from her parents, and at one point, the Strouts found about $200.00 missing from their home and concluded Mr. Beal had stolen it. The breaking point came in the winter and spring of 2003.

### D. "The Bad Donald"

Ms. Beal described her husband as "the good Donald" and "the bad Donald." When he had his drugs, he was the good Donald; when he did not, he turned bad. Each morning, he would feel the need for drugs. If he had drugs or money, he was happy; if he did not, he would lapse into

physical withdrawal symptoms and would throw up and get a headache and chills. He would then proceed to badger Ms. Beal for money. From a generally bad mood, he would gradually work himself into a rage. He became cranky, yelled, and would get "madder and madder" until she came up with some money. He would throw things, and three times he punched the wall hard enough to make holes.

### E. "The Bad Donald's" Coercion

When her husband acted this way, Ms. Beal was scared. During at least one of his tirades in late 2002, he physically threatened her: "You'd better give me the money or I'll slap you."[3] He never, however, carried out this threat; he never touched her in anger. On one occasion, he spat at her.[4] His rants and tirades frightened her and she felt a profound sense of shame.

### F. Doris Dorr: The Drug Dealer and Her Threats

Mr. Beal's drug dealer was Doris Dorr, a woman in her late forties. Mrs. Dorr is a big woman, ranging 5'11" to 6'0 tall and weighing in at 180 to 190 pounds. The Beals paint different pictures of Mrs. Dorr. Mr. Beal testified Mrs. Dorr never threatened him for money. He said the most money he ever owed Mrs. Dorr was only about $300.00, and when he fell behind, she would only say: "Pay me when you get it."

Ms. Beal tells a different story. She said that although she did not personally know Mrs. Dorr, she knew she was her

---

3. Ms. Beal testified Donald threatened more than once to strike her; Donald recalls doing so only once. In its Memorandum, the Government states that Donald threatened to "smash" Ms. Beal. Ms. Beal uses the term "strike" in her Memorandum, which is consistent with this Court's notes. Although "smashing" is a more serious threat than

"striking" or "slapping," the parties nevertheless agree Donald never actually struck Ms. Beal.

4. This is what Ms. Beal recalls; Donald testified he never spit at her. This Court assumes the truth of Ms. Beal's testimony on this point.

husband's supplier. On about three occasions, Mrs. Dorr called her husband at home when he was not there and Ms. Beal answered. Mrs. Dorr told her that her husband owed her money, and that she knew where they lived, where she worked, and where their daughter went to day care. Ms. Beal took this as a threat and she became concerned for herself, for her child, and for her husband. She never knew the amount of money her husband owed Mrs. Dorr, but thought it ran into the thousands of dollars.

Mrs. Strout testified that while babysitting at the Beals' home, Ms. Dorr called. Mrs. Strout had known Mrs. Dorr while growing up. Mrs. Dorr asked to speak with Mr. Beal and then left a message, saying that he owed her money and she wanted it. When Ms. Beal returned, Mrs. Strout told her daughter about the call and she replied: "Mom, let me handle it."

### G. The Crime

Ms. Beal began to steal money from the teller drawer at Union Trust as early as January or February 2003. By late April 2003, she was stealing in earnest. As vault teller, she was entrusted with counting the currency inside the vault at the close of business each day and manually entering the daily total into the computer by denomination. Conducted correctly, the running computer total by transaction matches the daily total, both by the breakdown in denominations and the total vault amount.

On May 22, 2003 and June 2, 2003, bank supervisors conducted "fine counts" of the money in the vault, manually counting the currency to determine whether the vault total matched the running totals. They came up $47,000.00 short. The bank then conducted a formal audit, which concluded that between April 29, 2003, and June 2, 2003, on twenty separate days, there were discrepancies between the denomination amounts on the computer running tallies and the daily vault totals prepared and entered by Ms. Beal. The audit later confirmed the missing total equaled $47,000.00. Union Trust fired Ms. Beal on June 9, 2003.

### H. Mr. Beal's Recovery

Mrs. Strout works at the Arnold Memorial Medical Center and knows Dr. Weisberger, a physician who runs an addiction treatment program. In late June 2003, through Mrs. Strout's intervention, Ms. Beal's efforts, Mr. Beal's determination, and Dr. Weisberger's professional assistance, Mr. Beal underwent a drug treatment program. The program worked wonders. Mr. Beal testified he has been drug free since he entered treatment in late June 2003.[5]

### I. Milbridge Days: A Second Victim

Ms. Beal did not stop stealing in June 2003. The Town of Milbridge puts on an annual celebration in late July—early August. After her termination from the bank, Ms. Beal obtained employment with the Milbridge Celebrations Committee and began stealing from the Town as well. She stole about $5,000.00.[6] When the Town discovered the theft, her parents

---

5. Mr. Beal's ability to recall dates was remarkably poor. At one point, he testified that he had been drug free for nine to ten months, which would have placed his recovery in January or February 2004, but he also testified he had had no drugs since entering treatment in late June 2003. This Court accepts the June date, since it is otherwise corroborated.

6. Ms. Beal was unclear how much money she took from the Town. As she stole the money, she did not keep a running total. She estimated she stole $1,000.00 to $2,000.00 in July and August 2003. However, there is other evidence it may have been as much as $5,000.00.

came up with the money to repay the Town and it dropped the matter.

## II. THE LAW

### A. U.S.S.G. § 5K2.12: Coercion and Duress

Ms. Beal argues her embezzlement was coerced by her husband's and his drug dealer's threats, and a downward departure is warranted under § 5K2.12.[7] Before a downward departure may be given, § 5K2.12 contains a number of limitations relevant to this case: 1) the defendant must have committed the offense "because of" the coercion or duress; 2) the coercion or duress must be "serious"; 3) ordinarily the coercion will be sufficiently serious only when it involves the "threat of physical injury ... or similar injury resulting from the unlawful action of a third party"; and, 4) "personal financial difficulties" do not warrant a downward departure.

This last limitation significantly affects the availability of a § 5K2.12 downward departure in this case. There is overwhelming evidence that the Beals were under enormous financial stress due to Mr. Beal's need for drugs. Simply put, it did not take long for annual expenses well over $90,000.00 to wreak havoc on an annual income of less than $50,000.00. The Guideline limitation, however, not only requires this Court to ignore as a basis for departure this financial factor, but also in effect requires this Court to deny the Motion if it concludes the Beals' "personal financial difficulties," as opposed to the threats, were in fact the cause of the embezzlement. *See United States v. Pozzy*, 902 F.2d 133, 139 (1st Cir.1990), *cert. denied*, 498 U.S. 943, 111 S.Ct. 353, 112 L.Ed.2d 316 (1990)(defendant not entitled to § 5K2.12 departure because her motivation was money); *United States v. Contreras*, 180 F.3d 1204, 1211 (10th Cir.1999), *cert. denied*, 528 U.S. 904, 120 S.Ct. 243, 145 L.Ed.2d 204 (1999)(daughter's financial dependence on father and economic coercion impermissible considerations).

7. The 2004 version of § 5K2.12 reads:

If the defendant committed the offense because of serious coercion, blackmail or duress, under circumstances not amounting to a complete defense, the court may depart downward. The extent of the decrease ordinarily should depend on the reasonableness of the defendant's actions, on the proportionality of the defendant's actions to the seriousness of coercion, blackmail, or duress involved, and on the extent to which the conduct would have been less harmful under the circumstances as the defendant believed them to be. Ordinarily coercion will be sufficiently serious to warrant departure only when it involves a threat of physical injury, substantial damage to property or similar injury resulting from the unlawful action of a third party or from a natural emergency. Notwithstanding this policy statement, personal financial difficulties and economic pressures upon a trade or business do not warrant a downward departure.

Ms. Beal committed the embezzlement in April—June 2003. On October 27, 2003,

§ 5K2.12 was amended to insert the language: "the proportionality of the defendant's actions to the seriousness of coercion, blackmail, or duress involved." U.S. Sentencing Guidelines Manual, app. C, amendment 651 (2003): If the amendment represented a change that could work a more severe sentence, Ms. Beal would be entitled to have the 2003 version applied to avoid an *ex post facto* issue. *See United States v. Harotunian*, 920 F.2d 1040, 1041–42 (1st Cir.1990). In this case, however, this Court views the proportionality language to clarify the earlier version. The pre-October 2003 language required the court to evaluate the "reasonableness" of the defendant's actions. Any assessment of "reasonableness" would necessarily include the proportionality of the defendant's illegal response to the degree of the coercion or duress. This Court, therefore, considers the 2003 revision as a clarification only and is applying the current version of the Guidelines. *See Isabel v. United States*, 980 F.2d 60, 62 (1st Cir.1992); *United States v. Morillo*, 148 F.Supp.2d 84, 88 (D.Mass.2001).

## B. Case Law

The First Circuit has given the sentencing courts guidance on the application of § 5K2.12. Ms. Beal bears the burden of persuading the court she is eligible for a § 5K2.12 downward departure. *United States v. Sachdev*, 279 F.3d 25, 28 (1st Cir.2002); *United States v. Rizzo*, 121 F.3d 794, 801 (1st Cir.1997). A defense of duress may play "two roles in a criminal case." *Sachdev*, 279 F.3d at 28. It may be presented at trial in avoidance of criminal liability or at sentencing to permit a downward departure under the Guidelines. *Id.* The "type and kind of evidence necessary to support a downward departure premised on duress is somewhat less than that necessary to support a defense of duress at trial." *United States v. Amparo*, 961 F.2d 288, 292 (1st Cir.1992), *cert denied*, 506 U.S. 878, 113 S.Ct. 224, 121 L.Ed.2d 161 (1992). Mere duress is "insufficient"; the duress must be "serious." *Sachdev*, 279 F.3d at 28. If coercion is invoked as a basis for a downward departure, the threat must ordinarily be a threat of physical injury. *Id.* at 29. If the conditions are met, however, a downward departure under § 5K2.12 is "encouraged." *Id.* at 28.

Although § 5K2.12 provides that the circumstances should be evaluated "as the defendant believed them to be," the First Circuit clarified that the standard is essentially an objective one. *Id.* at 29. The district court must "objectively determine whether a reasonable person in defendant's position would perceive there to be a threat, explicit or implicit, of physical injury ... resulting from the unlawful action of a third party." *Id.* In making this

determination, there are at least three questions to be considered: 1) the actual intent of the person alleged to have made the threat; 2) the subjective understanding of the defendant; and, 3) whether an objective third party could reasonably consider it to be a serious threat of physical injury. *Id.* As *Sachdev* stated, the "ultimate issue remains that of whether the defendant committed the offense 'because of' serious coercion, blackmail, or duress." *Id.*

The First Circuit has also explained its *Pozzy* decision. In *Pozzy*, the First Circuit rejected the district court's determination that Mrs. Pozzy's husband had coerced and threatened her to participate in his cocaine business. *Pozzy*, 902 F.2d at 139. *Sachdev* noted the Guideline's focus of the coercive effect on the defendant herself is "the underlying logic" of *Pozzy*. *Sachdev*, 279 F.3d at 29–30.

## III. DISCUSSION

There are two potential sources of coercion or duress in this case: Mr. Beal and Mrs. Dorr.

### A. Mr. Beal's Threat

Taking Mr. Beal first, the evidence confirms that on one occasion in late 2002, he threatened to slap, strike, or smash Ms. Beal.[8] Regarding the first *Sachdev* question, Mr. Beal confirmed he never physically harmed Ms. Beal and he never would have done so. This Court finds Mr. Beal made the threat to encourage his wife to disgorge money, but he never at any time intended to carry out his threat of physical violence.

---

8. Ms. Beal testified she was physically threatened more than once. Mr. Beal confirmed it happened only once. Having had the opportunity to observe Mr. and Ms. Beal, this Court concludes that on this point Mr. Beal is correct. When interviewed by the FBI on October 2, 2003, Ms. Beal gave a detailed statement, explaining why she had taken the money, but failed even to mention Mr. Beal's threat. If there had been more than one threat and if they had been the motivating factor behind the embezzlement, it is difficult to understand why she did not mention them.

Regarding her subjective understanding, this Court notes that the threat to strike or even smash Ms. Beal took place in late 2002. Although Ms. Beal testified she began to steal from her teller drawer as early as January 2003, the embezzlement of $47,000.00 did not begin until April 29, 2003, and continued through June 2, 2003. This Court cannot conclude Ms. Beal began stealing money from Union Trust in the spring of 2003 because her husband had physically threatened her once in late 2002. *See United States v. Anderson*, 139 F.3d 291, 300 (1st Cir.1998), *cert denied*, 525 U.S. 866, 119 S.Ct. 158, 142 L.Ed.2d 129 (1998)(downward departure denied because coercive effect of past physical violence was not present during relevant time period); *United States v. Arthurs*, 73 F.3d 444, 448–49 (1st Cir.1996)(a "lingering threat of future harm" is insufficient for a duress defense); *but see United States v. Amor*, 24 F.3d 432, 439 (2d Cir.1994)(the relationship between the threats and the crime was "close enough" to establish a "causal nexus").

The third question is whether an objective third party would reasonably consider Mr. Beal's threat a "serious threat of physical injury." Absent extraordinary circumstances not present here,[9] it is questionable whether a one time threat from one spouse to slap, strike or even smash the other, standing alone, without any evidence of actual physical violence in the relationship, could constitute serious enough duress to cause the other spouse months later to go out and embezzle $47,000.00 from her employer. Here, the threat was made in late 2002; in the interim, Mr. Beal never made good on his threat and did not even repeat it; and Ms. Beal perpetrated the crime beginning late April 2003. In these circumstances, this Court concludes if there ever was a serious threat of physical force, no reasonable person could consider Mr. Beal's distant and unrealized threat to be a serious threat of physical force when the crime was committed.

**B. Mrs. Dorr's Threats**

■ Turning to Mrs. Dorr, the evidence reflects about three telephone conversations occurred between Ms. Beal and Mrs. Dorr. During the last conversation, Mrs. Dorr impliedly threatened Ms. Beal. It is unclear when this last conversation took place. There is nothing in the record that confirms Mrs. Dorr actually took any concrete action against Ms. Beal, Mr. Beal, or their child. To the contrary, Mr. Beal testified that Mrs. Dorr never threatened him, telling him only "Pay me when you get it."

From this Court's perspective, there are a number of problems with a downward departure based on Mrs. Dorr's threats. First, this Court is troubled by the notion that Ms. Beal is entitled to a downward departure because she embezzled money under threats from a drug dealer to repay her husband's drug debt. Mrs. Dorr had no legal right to recover any money from Mr. Beal, much less from Ms. Beal, for their illegal drug deal and she certainly had no legal right to threaten Ms. Beal or her family.[10]

The complete duress defense requires there be "no reasonable alternative to vio-

---

9. *United States v. Sachdev*, 279 F.3d 25 (1st Cir.2002), discusses "battered person's syndrome" and the well-recognized fact that battered persons have a "particular vulnerability" to coercion or duress. *Sachdev*, 279 F.3d at 29, n. 2; *see also United States v. Hall*, 71 F.3d 569 (6th Cir.1995). There is no evidence

Ms. Beal was suffering from battered person's syndrome.

10. In this sense, the instant case is distinct from the *Sachdev* case, where there was no indication that the defendant's debt to the creditor was unenforceable.

lating the law." *Sachdev*, 279 F.3d at 28. Even under the less stringent standards for a duress downward departure, this Court concludes there is some obligation on the defendant to demonstrate she had no reasonable alternative to committing the criminal act. *See United States v. Lopez–Garcia*, 316 F.3d 967, 973 (9th Cir.2003)(defendant not entitled to § 5K2.12 downward departure, when she failed to tell border agents she was in danger and instead continued to smuggle aliens into the United States). Here, Ms. Beal could have gone to the authorities, told them about Mrs. Dorr's drug dealing and her threats, and secured their protection.[11] Although she could claim this was not a realistic alternative because she would have been required to reveal her husband's drug use, the alternative she elected instead was to steal $47,000.00 from her employer. Without evidence of Ms. Beal seeking a reasonable alternative to embezzlement, this Court is reluctant to legitimize a drug dealer's threats of physical harm by allowing them to form the basis of a downward departure for the commission of another crime in response. *But see United States v. Cotto*, 347 F.3d 441, 447 (2d Cir.2003)("A pattern of unlawful activity directed at the defendant by an alleged coercing party might, in some cases, obviate the need for a specific threat.").[12]

Second, this Court cannot conclude the evidence demonstrates a sufficient "causal nexus" between Mrs. Dorr's threats and Ms. Beal's embezzlement. The timing between Mrs. Dorr's threats and Ms. Beal's embezzlement remains unclear. Ms. Beal testified she first began to take money from Union Trust in January 2003 and began to embezzle large sums in late April. If Mrs. Dorr's threats were in January, just before she began stealing, it is difficult to conclude she escalated her thefts in late April because of the lingering impact of the January threat. On the other hand, if the threats were in late April, she has demonstrated her willingness to steal from her employer without any threat. Either way, the timing between threat and crime raises questions about her true motivation in perpetrating the embezzlement.

Third, it is difficult to correlate the amount of the drug debts and the money she embezzled. Mr. Beal testified the most he ever owed Mrs. Dorr was only about $300.00; yet, Ms. Beal embezzled $47,000.00 over a period just under five weeks. This Court accepts Mr. Beal's implicit version of his transactions with Mrs. Dorr: he would generally pay for the drugs when he got them and did not run up a large debt to Mrs. Dorr. In addition, it accepts Mr. Beal's testimony that he spent about $250.00 to $300.00 per day on drugs or about $9,000.00 per month. Assuming Mr. Beal had a $300.00 debt to Mrs. Dorr in late April, Ms. Beal would quickly be able to pay off this debt, leaving $46,700.00 for Mr. Beal's drugs during the month of May, a figure far in excess of what he said he spent for drugs. The conclusion is inescapable that Ms. Beal stole the money from the bank not to repay the modest drug debt to Mrs. Dorr, but primarily to respond to her personal financial difficulties, a prohibited ground for departure.

Finally, Mr. Beal sought treatment in late June 2003, but Ms. Beal continued to steal money. She testified she took

---

11. Ms. Beal did not even enlist her mother's help, when her mother fielded the call from Mrs. Dorr. Instead, she told her mother she could "handle it."

12. Even in *United States v. Cotto*, 347 F.3d 441 (2d Cir.2003), however, the Second Circuit noted the defendant had not asserted that "extricating herself from the relationship would have been difficult or impossible." *Cotto*, 347 F.3d at 447.

$1,000.00 to $2,000.00 from the Milbridge Days Committee during July and early August 2003.[13] Mr. Beal testified he had been clean ever since entering treatment. Assuming he owed the maximum of $300.00 to Mrs. Dorr when he stopped taking drugs in late June, logic dictates that Ms. Beal did not steal the additional $1,000.00 to $2,000.00 in July and August solely to repay his drug debt. Again, the conclusion is inescapable that she stole to address her personal financial difficulties. *See United States v. Sammoury*, 74 F.3d 1341, 1346 (D.C.Cir.1996)(§ 5K2.12 downward departure denied where defendant continued stealing to pay personal debts after being separated from her abusive husband).

## IV. CONCLUSION

The Defendant has failed to sustain her burden to demonstrate her entitlement to a § 5K2.12 downward departure on the basis of coercion or duress. This Court DENIES her Motion for Downward Departure under § 5K2.12.

---

13. This Court received a letter from Robert E. Carter, Jr., Senior Vice President of Union Trust Company, the victim. He attached a July 23, 2004 newspaper article from the Bangor Daily News that quoted Lewis Pinkham, the Milbridge Town Manager, as saying that Ms. Beal had stolen "more than $5,000" from the Committee during fund raising events "between August and December." Mr. Pinkham's statement, as cited, contradicts Ms. Beal's testimony. For purposes of this ruling, however, this Court has not considered the Bangor Daily News article, because Mr. Pinkham was not called to testify.